TERRELL, Comptroller of Public Accounts, v. MIDDLETON. (No. 5689.)* ·

(Court of Civil Appeals of Texas. San Antonio. June 14, 1916. Rehearing Denied June 29, 1916.)

1. STATES ⟋168½—INJUNCTION—ACTION— RIGHT OF ACTION.

A citizen and taxpayer may institute and maintain an action to restrain state officers from performing illegal and unauthorized and unconstitutional acts, since, when a state officer acts without legal authority, he is not acting for or in the interest of the state, and suit against him is not a suit against the state.

[Ed. Note.—For other cases, see States, Dec. Dig. ⟋168½.]

2. STATES ⟋168½—INJUNCTION—GROUNDS— PUBLIC OFFICES—ACTS WHICH MAY BE RESTRAINED—STATUTE.

Rev. St. 1911, art. 5732, providing that no court shall have the power, authority, or jurisdiction to issue the writ of mandamus or injunction or any other mandatory or compulsory writ of process against any of the officers of the executive department of the government to compel the performance of any act, or duty which they are by law authorized to perform, does not deprive the district court of power to restrain the performance of an illegal or unconstitutional act by a state officer, since there is a distinction between compelling an officer to perform a legal duty and restraining him from carrying into effect an illegal act.

[Ed. Note.—For other cases, see States, Dec. Dig. ⟋168½.]

3. STATES ⟋168½—TAXPAYERS' ACTION— JURISDICTION—DISTRICT COURT—STATUTE.

In view of Rev. St. 1911, art. 1526, as revised by Acts 33d Leg. c. 55, authorizing the Supreme Court to issue warrants of quo warranto or mandamus against any district judges or state officers except the Governor, the District Court, which is one of general jurisdiction, retains jurisdiction to issue an injunction against a state comptroller to restrain him from issuing warrants on the state treasurer covering expenditures made by the Governor.

[Ed. Note.—For other cases, see States, Dec. Dig. ⟋168½.]

4. CONSTITUTIONAL LAW ⟋70(1)—ENCROACHMENT ON LEGISLATURE—RIGHT TO DETERMINE CONSTITUTIONALITY OF STATUTE.

It is settled beyond recall that the courts, state and federal, have the power to pass upon the constitutionality of statutes and the authority to ultimately destroy or enforce laws passed by the legislative branch of the government.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129, 132, 137; Dec. Dig. ⟋70(1).]

5. CONSTITUTIONAL LAW ⟋67—DISTRIBUTION OF POWERS—LEGISLATURE.

When discretion is confined to any one branch of the government, a decision upon that particular point cannot be questioned or revised.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 123; Dec. Dig. ⟋67.] ·

6. STATES ⟋60—COMPENSATION OF GOVERNOR — STATUTES — CONSTRUCTION — CONSTITUTIONAL PROVISIONS.

An act passed February 11, 1915 (Acts 34th Leg. c. 9), making an appropriation covering deficiencies for fuel, water, lights, etc., for the Governor's mansion, but including items for food, automobile repair, punch, water, hire, and coal, for the Governor's private use, is violative of Const. art. 4, § 5, providing that the Governor shall receive as compensation for his services an annual salary of $4,000 "and no

---

more" and shall have the use and occupation of the Governor's mansion, fixtures, and furniture; and Const. art. 16, § 6, providing that no appropriation for private individual purposes shall be made.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 43, 61, 63; Dec. Dig. ☞60.]

**7. CONSTITUTIONAL LAW ☞26—CONSTRUCTION OF CONSTITUTION.**

A state Constitution should be liberally construed in contradistinction to a strict construction of the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 30; Dec. Dig. ☞26.]

**8. STATES ☞120—DEBTS—STATUTES—CONSTRUCTION—CONSTITUTIONAL PROVISIONS.**

Under Const. art. 3, § 49, providing that no debt shall be created by or on behalf of the state except to support casual deficiencies of revenue, and Rev. St. 1911, art. 4342, authorizing appropriations to cover deficiencies, a bill making an appropriation for water, fuel, lights, etc., for the Governor's mansion, and covering items for food, liquors, engraved cards, and invitations for the Governor's private use, is invalid.

[Ed. Note.—For other cases, see States, Cent. Dig. § 119; Dec. Dig. ☞120.]

**9. CONSTITUTIONAL LAW ☞50—POWERS OF LEGISLATURE.**

A Legislature has plenary powers subject only to constitutional limitations.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 48, 49; Dec. Dig. ☞50.]

**10. STATES ☞119 — LIMITATION ON CREDIT OF STATE—CONSTITUTIONAL PROVISIONS.**

A bill appropriating money to pay bills contracted by the Governor for water, fuel, lights, etc., for the Governor's mansion, containing items for food, liquors, groceries, and automobile repairs for the Governor's private use, is violative of Const. art. 3, § 50, providing that the Legislature shall have no power to authorize the giving or lending of the credit of the state for the payment of the liabilities of an individual.

[Ed. Note.—For other cases, see States, Cent. Dig. § 118; Dec. Dig. ☞119.]

**11. CONSTITUTIONAL LAW ☞43(1) — ENFORCEMENT OF CONSTITUTIONAL PROVISIONS.**

Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the Constitution and appointed judicial tribunals to enforce it.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 41; Dec. Dig. ☞ 43(1).]

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Suit for injunction by W. C. Middleton against H. B. Terrell, Comptroller of Public Accounts of Texas. Judgment for plaintiff, and defendant appeals. Affirmed.

Pat M. Neff, of Waco, for appellant. John W. Hornsby, of Austin, for appellee.

FLY, C. J. This is a suit by appellee against the comptroller of public accounts of Texas to restrain him from issuing warrants on the state treasurer, covering certain expenditures made and incurred by O. B. Colquitt, while occupying the office of Governor of the state of Texas. The items of expenditure and bills of expense incurred by said Governor began in June, 1914, and were for gas, ice, telephones, "merchandise," automobile repair to machine (the private property of the Governor), food for horses privately owned by him, chickens, vegetables, butter, eggs, gasoline, "groceries," bread, cakes, meat, "horse shoeing," "invitation cards and envelopes" for private use, "chicken salad," Saratoga flakes, punch, waiter hire, and coal. It was alleged that the amounts due for such articles could not be made the basis of claims against the state of Texas, and were in direct contravention of section 5, art. 4, of the state Constitution, which provides for the compensation of the Governor, and that the Legislature had no power or authority under that article to make, but is prohibited thereby from making, an appropriation for such purposes, as well as by section 51, art. 3, of the Constitution, which provides that:

"The Legislature shall have no power to make any grant, or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporation whatsoever."

Appellant filed general and special exceptions to the petition, and alleged that the articles itemized and set out were purchased by O. B. Colquitt, as Governor, and not for his private purposes; that an appropriation was made by the Legislature on February 11, 1915, to cover deficiencies for "fuel, light, water, groceries and incidentals for the Governor's mansion and grounds"; and that the comptroller was authorized to issue his official warrants for the debts enumerated in the petition. It was further pleaded that all the debts were created by virtue of article 4342, Revised Statutes, which provides for the creation of deficiencies and pay therefor. The most of the answer consisted of legal deductions and conclusions, few facts being pleaded.

A temporary injunction was issued, and the cause was afterward tried by the court without a jury, and the temporary injunction was perpetuated as to the account of the Driskill Hotel for $76.50 for punch, as to account of Driskill Hotel for 15 gallons of chicken salad $90, 5 gallons of olives $7.50, 2 cases of Saratoga flakes $2, almonds $7.50, and case for same $2, 12 gallons coffee $6, sugar $1.50, 14 pounds of mints $8.40, lettuce $5, waiters $12.50, and cooks and helpers $13, amounting in the aggregate, after deducting $3 for olives returned, to $152.40; as to account of Tobin Book Store for 500 engraved and embossed invitations $32.50, and 500 embossed cards and envelopes $21, amounting to $53.50; as to account of W. A. Achilles & Co. for $98.50 for groceries; as to account of Maerki's Bakery for $14.20 for groceries; as to account of Excelsior Meat Market for $12; as to account of Bryant Bros. for $2.50; as to account of W. J. Forster for $62.45. The temporary injunction was dissolved as to other items, consisting of charges for wa-

ter, lights, telephone service, and perhaps other things.

[1] The first assignment of error assails the action of the trial judge in overruling an exception questioning the authority of a taxpaying citizen to institute and maintain a suit to restrain the comptroller from issuing warrants; the reasoning being that the plaintiff has no interest in the subject-matter of this suit, and that the "pleadings affirmatively show that he has no interest in the suit other than as a citizen and as a taxpayer in general with other citizens and other taxpayers." The allegations affirmatively showed that appellee as a citizen of Texas and a taxpayer had the right, power, and authority to institute and maintain a suit to restrain state officers from performing illegal, unauthorized, and unconstitutional acts. When a state officer acts without legal authority, he is not acting for or in the interest of the state, and a suit against him is not a suit against the state. In deciding who are parties to the suit the court will not look beyond the record. Making a state officer a party does not make the state a party, although her law may have prompted his action, and the state may stand behind as a real party in interest. A state can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation. Osborn v. U. S. Bank, 9 Wheat. 738, 6 L. Ed. 204. To the same effect are United States v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171, and Conley v. Daughters of Republic, 151 S. W. 877. In the latter case a writ was granted and the judgment reversed, but in the remarkable opinion by the Supreme Court nothing was said against the holding that the suit was not one against the state.

Appellee was seeking to prevent the diversion of taxes collected by the state, a portion, no matter how small, of which had been paid by appellee. Citizens are allowed to prevent, by injunction, the collection of illegal taxes, and the reasons for allowing them this power are no stronger than to allow restraint of an officer who seeks to expend the taxes when collected for an illegal or unconstitutional purpose. The diversion of the taxes after collection from legal purposes would be equally as injurious to the taxpayer as the collection of illegal taxes. In either event, the burdens of the taxpayer are increased. As said by the Supreme Court of the United States in Crampton v. Zabriskie, 101 U. S. 609, 25 L. Ed. 1070, and quoted and approved by the Supreme Court of Texas in City of Austin v. McCall, 95 Tex. 565, 68 S. W. 791:

"Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county, or the illegal creation of a debt which they in common with other property holders of the county may otherwise be compelled to pay, there is at this day no serious question. * * * Certainly in the absence of legislation

187 S.W.—24

restricting the right to interfere in such cases to public officers of the state or county, there would seem to be no substantial reason why a bill by or on behalf of individual taxpayers should not be entertained to prevent the misuse of corporate powers."

[2, 3] The district court is one of general jurisdiction, and, unless original jurisdiction of any case is specially given by law to some other court, it can exercise jurisdiction over it. Therefore, unless the exclusive authority to try any case similar to the one at bar is given to some court other than the district court, it has the right, power, and authority to hear and determine it.

In 1881, an act was passed by the Seventeenth Legislature providing:

"No court of this state * * * shall have power, authority or jurisdiction to issue the writ of mandamus or injunction or any other mandatory or compulsory writ or process against any of the officers of the executive departments of the government of this state to order or compel the performance of any act or duty which, by the laws of this state, they, or either of them, are authorized to perform, whether such act or duty be judicial, ministerial or discretionary." Gammell's Laws of Texas, p. 7.

By the terms of that law no court could compel, by any writ, the performance of any act or duty of any state officer; but it is not even hinted that the district court would not have the power and authority to restrain the performance of an illegal and unconstitutional act by a state officer. There is a marked difference in compelling the performance of a duty and the prevention of the violation of a law to the prejudice of a taxpayer. The act of 1881 is embodied in the Revised Statutes of 1911, as article 5732.

In 1892, after an amendment to the Constitution in 1891, an act was passed authorizing the Supreme Court, in term time or vacation, to issue writs of quo warranto or mandamus against any district judge or officer of the state government, except the Governor of the state. The law in question, which is article 1526, Revised Statutes 1911, was amended in 1913, page 107 Laws of Regular Session, by inserting "or Court of Civil Appeals, or judge of a Court of Civil Appeals." In this law the power to issue injunctions against a state officer is not given, the only power being to issue writs of quo warranto or mandamus. It follows that in the absence of special power, authority, and jurisdiction being lodged in the Supreme Court, or some other court, to enjoin a state officer from a violation of the Constitution, the law has vested that authority in the district court, the only court of general jurisdiction in the state. The Supreme Court can only enforce the performance of a legal duty, but has no authority to enjoin the execution of an act except in protecting its jurisdiction. If the Supreme Court has no jurisdiction to act in a case like this, then to whom can the taxpayer look for redress except to the district court to whom all jurisdiction is given, except that specially confided to other courts? There is

nothing to the contrary in the cases of Bledsoe v. Railway, 40 Tex. 564, Messner v. Giddings, 65 Tex. 301, and McKenzie v. Baker, 88 Tex. 677, 32 S. W. 1038, cited by appellant. Appellant does not seem to recognize the distinction between compelling an officer to perform a legal duty and restraining him from carrying into effect an illegal act. This is undoubtedly the construction placed upon the law by the Supreme Court. Teat v. McGaughey, 85 Tex. 478, 22 S. W. 302. The Supreme Court has never attempted, as an act of original jurisdiction, to restrain the infraction of a law or the Constitution upon the part of any one. Our view of the matter is fully sustained in a clear and exhaustive opinion of the Court of Civil Appeals of the Third District, delivered through Judge Key. Kaufman County v. McGaughey, 3 Tex. Civ. App. 655, 21 S. W. 261. In that case the Commissioner of the General Land Office took the same position assumed by the comptroller in this, and the court said:

"In this suit it is not sought to compel either of the defendants to do any act or perform any duty which they are authorized to perform; but, on the contrary, the gist of the plaintiff's case lies in the averment that the acts complained of have been, or will be, committed without and in excess of lawful authority. Manifestly, if, prior to the passage of the statute in question, the district courts were clothed with power to restrain the officers designated therein from the commission of acts without and beyond lawful authority, this statute was not intended to abridge or affect such power. The defendants, by excepting to the court's jurisdiction, deny its power to determine whether or not the acts are within the scope of lawful authority; and this denial rests solely upon the fact that the petition shows one of the defendants to be the head of one of the executive departments of the state. This contention involves the proposition that if such officers choose to exceed their powers, however much the excess or great the injury, the courts cannot interpose to prevent them."

That court held, as we do, that the district court had jurisdiction.

In the case of Sterrett v. Gibson, 168 S. W. 16, this court, in passing upon the statute which clothes the Supreme Court with authority to issue writs of quo warranto or mandamus to heads of departments, held:

"The exclusive jurisdiction of the Supreme Court is confined to cases in which it is sought to compel an officer of the executive department to do or perform an act or acts enjoined upon him by the laws of the state, and the statute does not apply to cases in which the rights of persons or property are invaded by such officer. In such cases, swift, decisive action is demanded, and redress would be practically denied for trespasses and torts committed by members of the executive department. What act or duty is appellee seeking to order or compel the commissioner to perform that is authorized by the laws of Texas? He is not seeking to compel him to perform any act or duty, but to restrain him from performing an act or duty enjoined upon him by the laws of the state, which appellee claims are invalid."

A writ of error was denied in that case by the Supreme Court.

The first assignment of error has no merit and is overruled.

[4, 5] The second assignment of error assumes that nothing can be held unconstitutional by a court that had met with the sanction of a legislative body. To accede to such a proposition would be to hold that the Supreme Court of the United States for over a century has been usurping power and playing the part of a tyrant in passing upon the constitutionality of laws passed by the Congress of the Union. Whatever doubts may have existed at one time as to the authority of courts to decide upon the constitutionality of statutes, that matter has been definitely settled in favor of the affirmative, and while it may be a subject of regret that the court of last resort has seemed desirous at times of usurping the full powers of the government, and laying itself open to the charge of shaping the policies and principles of our government, the fact has been settled beyond recall that courts, federal and state, have the authority to ultimately destroy or enforce laws passed by the legislative branch of the government. The matter is too well settled now for this court to desire to enter into a discussion of it. The assignment of error raising this point is not followed by proposition or authorities that have any pertinency or relevancy to the matters sought to be raised by the assignment, and it, as well as the third assignment, which is like unto it, is overruled. If an act of the Legislature is unconstitutional, the sanction of that body, although reinforced by the approval of the Governor, cannot infuse into it vitality and validity. To so hold would be to hold that no act of the Legislature which has met with executive approval could ever be attacked. In other words, it would clothe Legislatures with infallibility. No such doctrine has ever been promulgated by any Texas court. No one disputes the proposition laid down in March v. State, 44 Tex. 64, and cognate cases; the only proposition being that, when a discretion is confided to any one branch of the government, a decision upon that particular point cannot be questioned or revised. No court would hold that, if a Legislature voted to give the Governor $10,000 a year as salary, such act could not be inquired into because it had met with legislative and executive sanction, and yet that is, in its ultimate analysis, the contention of appellant. If an act of the Legislature is not sanctioned by the Constitution, no legislative approval can make it valid, or render it immune from attack in the courts of the country.

[6, 7] The fourth, fifth, sixth, and seventh assignments of error are grouped, and they embody the proposition that the Constitution of Texas permits and authorizes the appropriation of moneys of the state to purchase the groceries, the gasoline, the stationery to be used for social functions, and other articles of comfort, necessity, and luxury desired by the Governor. This brings us to the consideration of the only vital point in this

case, the others considered by us being mere technical matters as to parties and as to the powers of district and appellate courts. To properly understand the points of contention in this case, it will be interesting and instructive to call to mind the circumstances under which the present Constitution was adopted.

It is within the memory of older citizens, and known to all intelligent citizens through the medium of history, that after the close of the fratricidal strife between the North and South, in 1865, when the starved and beaten armies of the South returned to their desolated homes to struggle for a livelihood for their impoverished families, a horde of adventurers, aided by citizens who had opposed secession, filled with hatred for our people and seeking for spoils, with the backing of the strong arm of the military, and aided by the disfranchisement of the whites and the enfranchisement of the negroes, seized the reins of government and engaged in exploiting the state and directing its affairs for the financial as well as political benefit of the flotsam and jetsam cast by the chances of war upon a helpless people. The citizens were burdened with oppressive taxes, which were used in the interest of office holders raised to power by an irresponsible, ignorant, and vicious electorate, and the rights of those bearing the burdens laid on them by the political party that had seized the reins of government were ignored and trampled upon. In 1873, when the burdens had reached their limit, when an armed constabulary of former slaves surrounded the polls and sought to intimidate the whites, the freemen of Texas went to the polls and recorded their condemnation of the state administration and elevated Richard Coke to the governorship. The first efforts of the enfranchised citizens of Texas were to obliterate the Constitution foisted upon them largely by renegades, carpetbaggers, and scalawags, and to re-establish a free government. A constitutional convention was called and met in the city of Austin, on September 6, 1875, which framed the present Constitution. The farmers of Texas constituted a large proportion of that convention, and, writhing under the exactions and extortions of the state government forced upon them, the pendulum swung from the extreme of riotous and irresponsive expenditure of public money to the extreme of close economy, if not penuriousness. All kinds of expenses were cut down, and every constitutional bar to extravagance that could be anticipated was inserted in an instrument which when completed had more the appearance of a code of laws than an enunciation of organic principles upon which to build the laws. The desire for economy caused the convention to provide salaries which were small and insignificant even in that day of cheap living, and which in modern times have become niggardly and utterly insufficient. So

anxious were the members of that convention to hold down salaries and enforce strict economy, that they provided that the Governor of this imperial domain, containing more than 265,000 square miles, larger in extent than any government of Europe except Russia, should receive a beggarly salary of $4,000 per annum. They provided in article 4, § 5:

"He shall, at stated times, receive as compensation for his services an annual salary of $4,000.00."

And then, as if to anticipate a spirit of liberality or extravagance in the future, they command that he shall receive that sum "and no more," and then graciously added "and shall have the use and occupation of the Governor's mansion, fixtures and furniture."

A reference to the journal of the convention shows that John H. Reagan sought to have the words, "and no more," stricken from the provision as to the salary of the Governor; but it was voted down. The committee appointed to draft the Constitution reported in favor of a salary of $5,000 for the Governor, but by a vote of 44 to 32 it was reduced to $4,000. It was then attempted to append after the words, "and no more," the words, "until otherwise provided by law," which attempt was promptly voted down. In section 5 as reported, the word, "also," preceded, "the use and occupation of the Governor's mansion"; but it was stricken out. These acts of the convention tend to show that it was the determination and desire of the constitutional convention that the Governor should receive as compensation the sum of $4,000 and no more. It is to be regretted that the debates of that convention were not preserved, as they would illuminate the different portions of the Constitution and give an insight into the intent and desires of those composing the convention. One thing is apparent, however, not only from the plain and unequivocal words of section 5, but from the meager report of the proceedings of the convention, that it was the object and desire to confine the pay and emoluments of the Governor to $4,000 "and no more." Many of the delegates were desirous of cutting the Governor's salary from $4,000 to $3,000, and it was actually reduced from $5,000 as proposed by the committee to $4,000. We find that a delegate sought to ingraft on section 5 the sentence, "He shall receive no fees or perquisites, or extra compensation for the performance of any duties connected with his office"; but it was rejected. In the absence of the debate on the question, it cannot be definitely determined whether it was desired that he should receive perquisites or extra compensation, or whether it was thought that the words used were sufficiently comprehensive to cover the desired amendment. From the economical, if not parsimonious, trend of the convention, we are inclined to think that the last interpretation is more reasonable. The spirit of economy seems to have permeated and dominated the convention, not only as

to salaries, but as to advertising the resources of the state and as to all the affairs of the state government. The journal shows such recitations as "the present constitutional convention having reduced their salaries three-eighths of the original amount, of that which was paid members of the Legislature, 'and have promised their constituents and the people generally to practice rigid retrenchment." "Retrenchment" was the watchword of the hour, and everything was sacrificed to gain that end.

Considering the circumstances under which the convention met, the evils sought to be remedied, and the ends to be accomplished, as well as the personnel of the members, it cannot reasonably be held that it ever entered the mind of any member that the Governor, under the guise of maintaining the Governor's mansion, would be voted groceries to maintain his household, would be voted food and care of the Governor's horses, gasoline and repairs for his automobile, would be voted embossed cards and printed invitations to his social functions, and liquors, meat, vegetables, and fruits for his table. The "Grangers" who composed that convention would have arisen in their wrath and smitten the unfortunate delegate with their votes who would have dared to introduce a resolution permitting such rich perquisites and emoluments to the Governor. If he was to receive such a substantial addition to his salary, the words, "and no more," appended to the amount of the salary, are meaningless; for there can be no substantial difference in voting extra dollars to the Governor and paying the bills he has contracted for necessaries and luxuries purchased by him for himself and his family.

Clearly, the items for which the comptroller sought and desired to issue state warrants, and from which action he was restrained, were for private and individual purposes, and not for the public good, and the appropriation made for that purpose by the Legislature was directly in the face of article 16, § 6, of the Constitution, which commands that "no appropriation for private or individual purposes shall be made." The articles named were clearly not for the Governor in his official capacity, but for his individual satisfaction and gratification. No governmental or official object would be obtained by feeding and shoeing his horses, by repairing and furnishing gasoline for his automobile, or by furnishing groceries or other luxuries for him to consume.

[8] The appropriation by the Legislature to pay for the articles used by the Governor was made under the guise of covering a deficiency, and appellant actually contends that article 3, § 49, of the Constitution, and article 4342, Rev. Stats., authorize the Legislature to make provision for the payment of debts contracted by the Governor for provisions and other things purchased by him between Legislatures. We understand that the rule is that a state Constitution should be liberally construed, in contradistinction to a strict construction of the federal Constitution; but it is liberality of construction running riot, when items purchased for the table, automobile, horses, and library of the Governor can be ranked as "casual deficiencies of revenue," or "to repel invasion, suppress insurrection, defend the state in time of war or pay existing debts." None of these contingencies had arisen, and, in regard to the last named, the state had contracted no debt, and it was not in existence. There were no casual deficiencies of revenue to pay for luxuries and necessaries for the household of the Governor, because no attempt had been made to raise revenue for that purpose. No provision could be made for it, for the amount of it would depend on the taste and appetite of the individual who occupied the Governor's office. The Legislature was chary in its description of the items of the appropriation upon which the comptroller desires to draw his warrants. The language is:

"That the following sums be and they are hereby appropriated to cover deficiencies for the named purposes for the fiscal year ending August 31, 1915: For Governor's mansion, water, fuel, lights, etc., $1,500.00."

The "etc." was very comprehensive, and covered any conceivable articles of food or drink, gasoline, horse feed, stationery, and other articles. By a liberal construction of the Constitution, which was made by the trial judge, but about which an opinion of this court has not been sought, and consequently will not be given, water, fuel, and lights were allowed; but reason would stagger and common sense collapse with a holding that the articles bought for the use of the Governor's family and himself were "for Governor's mansion."

Whenever the line defined by the Constitution is once passed, there is no limit to the things for which appropriations will be asked and given. This is clearly shown by the growth of appropriations from Legislature to Legislature since the adoption of the Constitution. The first Legislature thereafter appropriated "$110 a year for gas for the Governor's mansion"; the second one included "$400 a year for a gardener" and "$200 a year for wood, lights, etc.," and a contingent fund of "$200 for each year for the mansion"; and so on down until by leaps and bounds the sum of $1,500 was appropriated, not to cover certain expenses, but to cover a deficiency created by the Governor for necessaries and luxuries for himself and family. In addition to the appropriation for a deficiency, the appropriation of "$110 a year for gas" has grown to $5,000 per annum for Governor's mansion, for labor and employés at mansion, and for "fuel, lights, water, ice and incidentals." Gen. Laws, Regular Session, 34th Legislature, p. 13. As the encroachments on the Constitution progressed,

each successive step is made a precedent and used as an argument to justify a disregard of the Constitution. The appropriation for the deficiency, out of which the items herein specified are sought to be paid, is in addition to an appropriation made in 1913 for $2,000 for each year of that administration.

The appropriation does not specify what it is intended to cover beyond "water, fuel, lights, etc.," and yet it is seriously argued that no citizen has the right to go back of that "etc.," and inquire into what is included under that omnibus provision. Did the Legislature know that it was appropriating money to pay for groceries and the other articles used by the Governor? If so, why did it halt at the articles named? Did it seek to conceal the subject of the appropriation? If an appropriation for "etc." is ever legal and valid, certainly the taxpayer, in spite of the sanctity with which appellant 'seeks to clothe the Legislature, should have the right to inquire into the matters for which the mysterious appropriation is made, and prevent the payment of any items prohibited by the Constitution. It is not a question of the manner of exercise of a power conferred by the Constitution, but the exercise of a power absolutely inhibited by the Constitution. It follows that the numerous authorities cited by appellant condemning the inquiry into the motives of a Legislature in the exercise of a valid power have no pertinency or applicability to an act done in violation of the Constitution.

[9] While not commending the expenditure by the Pennsylvania Legislature, as shown in Russ v. Commonwealth, 210 Pa. 544, 60 Atl. 169, 1 L. R. A. (N. S.) 409, 105 Am. St. Rep. 825, of money for the ceremonies attending the dedication of a monument, we can see the difference between that expenditure and one for the purpose of increasing the compensation of the Governor in violation of the Constitution. If there was any doubt, as expressed by the Pennsylvania court, as to the powers of their Legislature to make the appropriation of $6,100.64, about half of which was for liquors, there is no doubt in this case. It is not doubted that the Legislature has plenary powers, subject only to constitutional limitations, as expressed in the Iowa case of McSurely v. McGrew, 140 Iowa, 163, 118 N. W. 415, 132 Am. St. Rep. 248, and we are applying that rule to the act of the Texas Legislature in making its deficiency appropriation. We are willing to concede to our Legislature perfect freedom of action within the constitutional limits of its powers, but we are not called upon to respect and uphold an act not only unsupported by the Constitution, but in contravention of it.

[10] If, as contended through the medium of the eighth assignment of error, the purchase of groceries and other necessaries and luxuries for the support and maintenance of the Governor's household is not an increase in his compensation, we fail to see how a direct payment of money to him would be an increase. The proposition seems to be that, if the money was placed in the hands of the Governor and he had expended it for the articles mentioned, that would be in violation of the Constitution, but if he is allowed, by an appropriation to pay for his purchases, it would not be an increase of compensation. That is a species of sophistry that cannot meet with judicial sanction. The one is as much an increase as the other, and no number of "etcs." can cover it up. A lending of the credit of the state to a Governor for his private expenses, to increase his compensation is not only a violation of the constitutional provision as to his compensation, but is in violation of article 3, § 50, of the Constitution. The salary of $4,000 was given as the entire compensation of the Governor, and it is clearly provided that his compensation shall be no more than $4,000 annually.

Great stress is put upon the fact that Legislature after Legislature has interpreted the Constitution to give license to supply almost any article of food and drink and other comforts to the Governor, and an infraction of the Constitution is sought to be made sacred and impregnable by the numerous past infractions. As said in Story on Constitutions, § 407:

"Contemporary construction can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries."

The fact that the Legislature that met immediately after the adoption of the Constitution very modestly allowed gas for the Governor's mansion to the amount of $110 annually cannot be invoked to fortify an appropriation to victual and maintain the governor.

"Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the Constitution, and appointed judicial tribunals to enforce it. A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period, in violation of the constitutional prohibition, without the mischief which the Constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the Constitution." Cooley, Const. Lim. (7th Ed.) p. 106.

As said by the Court of Appeals of New York in People v. Allen, 42 N. Y. 378:

"No length of usage can enlarge legislative power, and a wise constitutional provision should not be broken down by frequent violations."

A wrong cannot be sanctioned by age and acquiescence, and transformed into a virtue. Indifference and lack of vigilance have lost some of the dearest rights to the people, but they can always be regained by energy and persistence.

[11] Courts hesitate to declare the acts of a co-ordinate branch of the government unconstitutional and void, and, in some instances where rights of property have sprung into existence by reason of the unconstitutional legislation, decline to interfere with the legislation, but a law passed in violation of the Constitution around which no rights of property have grown up should unhesitatingly be declared null and void.

"In exercising this high authority, the judges claim no judicial supremacy; they are only the administrators of the public will. If an act of the Legislature is held void, it is not because the judges have any control over the legislative power, but because the act is forbidden by the Constitution, and because the will of the people which is therein declared is paramount to that of their representatives expressed in any law." Cooley, Const. Lim. p. 228.

The will of a sovereign people as expressed through their organic law is supreme, and necessity, legislative construction, and legislative act cannot weaken, impair, or destroy it.

There is no doubt that the Governor of Texas is inadequately compensated for his services, and that his niggardly salary is a reproach upon a great people; but the people have evidenced no desire to recede from the provision of the Constitution that he shall receive as compensation $4,000 annually "and no more." Only a short time since a constitutional amendment was presented to the people which sought to increase the Governor's salary, but they promptly and vigorously voted it down. Their will, expressed in the Constitution and reiterated at the polls, cannot be circumvented and set aside by legislative action. There is no more sanctity in an appropriation bill than in any other act, and an unconstitutional appropriation cannot be covered up and hidden from judicial inquiry by a legislative "etc." If the Governor is miserably remunerated for his services, it is the province of the people, and not of the Legislature by evasion or disregard of the Constitution, to remedy it.

In conclusion, we quote the present Chief Justice of the Supreme Court in the case of Waples v. Marrast, 184 S. W. 180:

"Taxes are burdens imposed for the support of the government. They are laid as a means of providing public revenues for public purposes. The sovereign power of the state may be exercised in their levy and collection only upon the condition that they shall be devoted to such purposes; and no lawful tax can be laid for a different purpose. Whenever they are imposed for private purposes, as was said in Brodhead v. Milwaukee, 19 Wis. 670, 88 Am. Dec. 711, it ceases to be taxation and becomes plunder."

However commendable may be the desire of our Legislatures to add to the beggarly salary allowed the Governor of Texas, their liberality and sense of right and justice must give way to the mandate of the Constitution which commands that he receive $4,000 annually "and no more."

The judgment is affirmed.