## Bill WHITE, Mayor, City of Houston, and Houston City Council, Appellants,

v.

## Carroll G. ROBINSON, Bruce R. Hotze, and Jeffrey N. Daily, Appellees.

No. 14–06–00167–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 3, 2008.

Rehearing Overruled July 3, 2008.

Scott J. Atlas, Patrick W. Mizell, Catherine B. Smith, Melanie Plowman Sarwal, Stacey Neumann Vu, Arturo Michel, Patrick Zummo, Stephen Douglas Pritchett, Jr., Houston, for appellants.

Amanda Eileen Staine Peterson, Andy Taylor, Houston, for appellees.

Panel consists of Justices YATES, SEYMORE, and EDELMAN.*

## OPINION

CHARLES W. SEYMORE, Justice.

Appellees, Carroll G. Robinson, Bruce R. Hotze, and Jeffrey N. Daily, sued ap-

* Senior Justice Richard H. Edelman sitting by assignment.

pellants, Bill White, Mayor of the City of Houston, and Houston City Council (collectively "the City"), seeking a declaratory judgment that a citizen-initiated proposition passed by voters is valid and must be enforced. The trial court denied the City's plea to the jurisdiction and motion for summary judgment. The trial court granted appellees' motion for summary judgment and entered a final judgment.

The City presents six issues for review. First, the City contends the trial court had no authority to consider this suit because appellees were required to pursue an election contest or quo warranto proceeding. In its second and third issues, the City argues the trial court did not have subject matter jurisdiction because appellees lack standing to assert their claim. The City's fourth, fifth, and sixth issues pertain to the merits of appellees' claim: the City asserts the trial court erred by denying the City's motion for summary judgment and granting appellees' motion for summary judgment. We conclude the City's second and third issues are dispositive because appellees have failed to establish standing. However, appellees must be afforded a reasonable opportunity to amend their pleadings and cure the jurisdictional deficiency. Accordingly, we reverse the trial court's final judgment and remand.

## I. Background

The City approved an ordinance placing two propositions for amendments to the city charter on the ballot in a November 2004 election: "Prop. 1" and "Prop. 2."[1]

Prop. 1 was placed on the ballot pursuant to the City's own motion. Prop. 1 pertains to "Limits on Annual Increases in City Property Taxes and Utility Rates." Prop. 1 grants the City "full authority to assess and collect any and all revenues of the city without limitation, except as to ad valorem taxes and water and sewer rates." Although the full text of Prop. 1 was set forth in the election ordinance, the following summary was included on the ballot:

The Charter of the City of Houston shall be amended to require voter approval before property tax revenues may be increased in any future fiscal year above a limit measured by the lesser of 4.5% or the cumulative combined rates of inflation and population growth. Water and sewer rates would not increase more than the cumulative combined rates of inflation and population growth without prior voter approval. The Charter Amendment also requires minimum annual increases of 10% in the senior and disabled homestead property tax exemptions .through the 2008 tax year.

Prop. 2 resulted from a citizen-initiated referendum petition. Prop. 2 concerns "Limits on All Combined City Revenues." Although the full text of Prop. 2 was set forth in the election ordinance, the following summary was included on the ballot:

The City Charter of the City of Houston shall be amended to require voter approval before the City may increase total revenues from all sources by more than the combined rates of inflation and population, without requiring any limit of any specific revenue source, including water and sewer revenues, property taxes, sales taxes, fees paid by utilities and developers, user fees, or any other sources of revenues.

On the November 2004 ballot, the electorate was allowed to vote for or against each proposition. Prop. 1 and Prop. 2 each passed with a majority of the votes cast on the particular proposition.

1. "Prop. 3," relating to the City Controller's role in performing internal audits, was also included on the ballot, but this proposition is not at issue in this suit.

Prop. 1 received more favorable votes than Prop. 2.

After the election, for two independent reasons, the City determined Prop. 1 is legally binding and Prop. 2 would not be enforced. First, in the election ordinance, the following "poison pill" provision was included after the text of Prop. 1:

> If another proposition for a Charter amendment relating to limitations on increases in City revenues is approved at the same election at which this proposition is also approved, and if this proposition receives the higher number of favorable votes, then this proposition shall prevail and the other shall not become effective.

Citing this provision, the City asserts Prop. 1 must prevail because it received more favorable votes than Prop. 2.

Alternatively, the City relies on Article IX, Section 19 of the Houston City Charter which provides, in pertinent part:

> ... at any election for the adoption of amendments if the provisions of two or more proposed amendments approved at said election are inconsistent the amendment receiving the highest number of votes shall prevail.

The City posits that Prop. 1 and Prop. 2 are inconsistent; thus, Prop. 1 must prevail because it received more favorable votes.[2]

Appellees sued the City, seeking a declaratory judgment that Prop. 1 and Prop. 2 must both be added to the City Charter. As we will later discuss in more detail, appellees are Houston citizens who sponsored and voted for Prop. 2. In essence, appellees allege the "poison pill" provision is invalid because (1) it was not included within the text of Prop. 1 in the election ordinance, or (2) alternatively, enforcement of only Prop. 1 pursuant to the "poison pill" provision would violate the Texas Constitution and Local Government Code. Appellees also challenge the City's refusal to enforce Prop. 2 based on Article IX, Section 19 of the City Charter, alleging (1) Prop. 1 and Prop. 2 are not inconsistent and may peacefully coexist, or (2) alternatively, application of Article IX, Section 19 would violate the Texas Constitution and Local Government Code.

The City filed a plea to the jurisdiction, followed by a supplemental plea, contending, inter alia, that appellees lack standing to assert their claim. The City also filed a motion for summary judgment and a supplemental motion. The trial court denied the City's plea to the jurisdiction and motion for summary judgment. Subsequently, the trial court denied the City's request for reconsideration of its motion for summary judgment. Appellees also filed a motion for summary judgment which the trial court granted. The trial court then signed a final judgment. We are presented with the appeal from this final judgment.[3]

---

**2.** As the City notes, enforcement of only Prop. 1 pursuant to the "poison pill" provision does not require an inconsistency between Prop. 1 and Prop. 2. In contrast, Article IX, Section 19 of the city charter requires that amendments approved at the same election be inconsistent before the one receiving more votes must prevail.

**3.** Curiously, the final judgment omits any relief other than awarding attorney's fees to appellees. The trial court generally recited that it granted final judgment in favor of

appellees. The trial court also stated that it granted appellees' motion for summary judgment and denied the City's motion for summary judgment, motion for reconsideration, and motion for denial of attorney's fees. The trial court incorporated these orders into the final judgment. However, the trial court did not make any declarations regarding the rights of the parties. In particular, the trial court did not declare that Prop. 2 is effective as requested by appellees in their petition. Moreover, in the referenced orders, the trial

Meanwhile, appellees sought writs of mandamus in the First Court of Appeals, complaining that the City failed to perform certain ministerial duties with respect to the election. *See In re Robinson*, 175 S.W.3d 824, 826–27 (Tex.App.-Houston [1st Dist.] 2005, orig. proceeding). The court held that the Mayor had a non-discretionary duty to certify all the amendments, including Prop. 2, to the Secretary of State. *Id.* at 829–30 (citing Tex. Loc. Gov't Code Ann. § 9.007(a) (Vernon 2008)).[4] The court also held that City Council had a non-discretionary duty to enter an order in the city records declaring all the propositions had been adopted by voters. *Id.* at 830–32 (citing Tex. Loc. Gov't Code Ann. § 9.005 (Vernon 2008)).[5] However, the court specifically expressed no opinion on the validity of Prop. 2–the issue in the present case. *See id.*

## II. STANDING

■ In its second and third issues, the City contends that appellees lack standing to assert their claim. Standing is a constitutional prerequisite to maintaining suit in federal or state court. *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 307 (Tex.2007); *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex.2001). As a component of subject matter jurisdiction, standing is never presumed and cannot be waived. *See Tex. Ass'n of Bus. v. Tex. Air*

*Control Bd.*, 852 S.W.2d 440, 443–44, 445 (Tex.1993); *Concerned Cmty. Involved Dev., Inc. v. City of Houston*, 209 S.W.3d 666, 670 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). Subject matter jurisdiction in a declaratory-judgment action depends on whether the underlying controversy is within the court's jurisdiction; the Declaratory Judgment Act does not confer additional jurisdiction upon a court. *Rush v. Barrios*, 56 S.W.3d 88, 105 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

■ A party may challenge subject matter jurisdiction by a plea to the jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex.2000); *In re Sullivan*, 157 S.W.3d 911, 914 (Tex.App.-Houston [14th Dist.] 2005, orig. proceeding, [mand. denied] ). A plea to the jurisdiction is a dilatory plea; it is filed to defeat claims, regardless of whether they have merit. *Bland*, 34 S.W.3d at 554; *Sullivan*, 157 S.W.3d at 914. When reviewing a trial court's order on a plea to the jurisdiction, we may not weigh the claim's merits but must consider only the pleadings and evidence relevant to the jurisdictional issues. *Bland*, 34 S.W.3d at 554–55; *Sullivan*, 157 S.W.3d at 914–15. When a plea to the jurisdiction challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating the trial court's jurisdiction. *Tex. Dep't of Parks*

---

court did not make any declarations. Nevertheless, because appellees lack standing, we need not consider the effect of a judgment which does not expressly grant any relief except attorney's fees.

4. *See* Tex. Loc. Gov't Code Ann. § 9.007(a) (Vernon 2008) ("As soon as practicable after a municipality adopts a charter or charter amendment, the mayor or chief executive officer of the municipality shall certify to the secretary of state an authenticated copy of the charter or amendment under the municipality's seal showing the approval by the voters of the municipality.").

5. *See* Tex. Loc. Gov't Code Ann. § 9.005 (Vernon 2008) ("(a) A proposed charter for a municipality or a proposed amendment to a municipality's charter is adopted if it is approved by a majority of the qualified voters of the municipality who vote at an election held for that purpose. (b) A charter or an amendment does not take effect until the governing body of the municipality enters an order in the records of the municipality declaring that the charter or amendment is adopted.").

*and Wildlife v. Miranda* 133 S.W.3d 217, 226 (Tex.2004) (citing *Tex. Ass'n of Bus.* 852 S.W.2d at 446).[6] We construe the pleadings in the plaintiff's favor and look to the pleader's intent. *Id.* (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 446); *Sullivan*, 157 S.W.3d at 914. Standing is a question of law that we review de novo. *Concerned Cmty.*, 209 S.W.3d at 670 (citing *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998)).

 Standing may be predicated upon common-law or statutory authority. *See Williams*, 52 S.W.3d at 178–79; *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex.1984). The common-law rules governing standing apply except when standing is conferred by statute. *Williams*, 52 S.W.3d at 178–79; *Hunt*, 664 S.W.2d at 324. In this case, appellees contend (1) they satisfy the common-law rules governing standing, or (2) alternatively, Prop. 2 includes a provision that is analogous to statutory conferral of standing. We disagree with both contentions.

## A. Common–Law Rules Governing Standing

 The common-law rules governing standing require "a real controversy between the parties, which ... will be actually determined by the judicial declaration sought." *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex.2001); *Tex. Ass'n of Bus.*, 852 S.W.2d at 446; *Concerned Cmty.*, 209 S.W.3d at 670. Generally, to have standing, a plaintiff must demonstrate he "possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury." *Williams*, 52 S.W.3d at 178–79; *Concerned Cmty.*,

209 S.W.3d at 670; *see Lomas*, 223 S.W.3d at 307; *Brown*, 53 S.W.3d at 302.

In their live pleadings, appellees claim they satisfy this standard because each participated in some or all of the following activities: (1) organized a petition drive for Prop. 2; (2) helped draft the final wording of the petition and participated in underwriting this effort; (3) signed the petition later known as Prop. 2; (4) worked on the "Let the People Vote" and "Vote Yes on Prop 2" campaigns to ensure passage of Prop. 2; (5) contributed substantially to the "Vote Yes on Prop 2" campaign; (6) were leaders in the "Vote Yes on Prop 2" advertisement campaign; and (7) voted in favor of Prop. 2.

The parties do not cite, and we have not found, authority directly addressing whether a plaintiff possesses standing by virtue of these activities to challenge a city's interpretation of, and refusal to enforce, a citizen-initiated municipal proposition adopted by voters. Appellees rely on two Texas Supreme Court cases to support the contention that they have standing by virtue of these activities: *Glass v. Smith*, 150 Tex. 632, 244 S.W.2d 645 (1951); and *Blum v. Lanier*, 997 S.W.2d 259 (Tex. 1999).

In *Glass*, several members of the City of Austin fire department signed an initiative petition to call an election on a proposed ordinance concerning employment issues. 244 S.W.2d at 647. The Texas Supreme Court affirmed a writ of mandamus requiring city authorities to hold an election after the requisite number of signatures were collected. *See id.* at 648, 653–54. The court held that the plaintiffs, as petition signers, had a justiciable interest in

---

**6.** In this case, the City does not dispute appellees' factual allegations purportedly establishing standing. The City merely contends that, as a matter of law, these facts do not confer standing. Further, there are no factual issues created by the evidence pertinent to the jurisdictional issue.

ensuring their proposed ordinance was submitted to the electorate. *See id.*

More recently, in *Blum*, the plaintiff spearheaded a petition drive, and signed the petition, to propose an amendment to the City of Houston charter ending preferential treatment in public employment and contracting. 997 S.W.2d at 260, 261. The City Council adopted an ordinance calling an election on the proposed amendment. *Id.* at 261. The plaintiff objected to the description of the amendment to be used on the ballot. *Id.* The Texas Supreme Court ultimately held that the plaintiff had standing to seek injunctive relief forbidding the City's use of misleading language. *See id.* at 260–65. Relying in part on *Glass*, the court stated that petition signers, as sponsors of an initiative, possess a justiciable interest in the valid execution of the election that is distinct from the interest possessed by the general public. *Id.* at 262 (citing *Glass*, 244 S.W.2d at 648, 653–54).

Citing *Glass* and *Blum*, appellees argue that their sponsorship of Prop. 2 and involvement to ensure passage establish standing to challenge the City's refusal to enforce the proposition. In contrast, the City argues that these facts are insufficient to establish standing and *Glass* and *Blum* are inapplicable. The City primarily relies on *Brown*, 53 S.W.3d 297. Although *Brown* is not directly on point, it does support the contention that appellees lack standing.

In *Brown*, Houston City Council approved an ordinance prohibiting discrimination based on sexual orientation in city employment and contracting. *Id.* at 299. Pursuant to a procedure authorized by the city charter, the plaintiff and other citizens organized a campaign to repeal the ordinance. *Id.* At a referendum election in 1985, voters, including the plaintiff, rejected the ordinance. *Id.* In 1998, the Mayor issued an executive order, prohibiting discrimination based on sexual orientation in municipal employment and city programs. *Id.* Nine days later, the plaintiff sued the Mayor and the City, seeking a declaration that the executive order was invalid and an injunction against its enforcement. *Id.*[7] The plaintiff alleged that the executive order nullified the 1985 election results and usurped City Council's authority. *Id.*

The Texas Supreme Court ultimately held that the plaintiff lacked standing. *Id.* at 302–04. The plaintiff claimed standing because he voted for the prevailing 1985 referendum rejecting the anti-discrimination ordinance and the subsequent executive order negated his vote. *Id.* at 302. The court concluded the plaintiff did not possess a sufficiently peculiar interest based on his status as a voter and he failed to identify a unique injury. *See id.* Instead, his injury was shared by all 198,563 electors who voted for the 1985 referendum rejecting the anti-discrimination ordinance. *Id.* Accordingly, the plaintiff had no standing to protect his "no" vote from future action. *Id.* at 303.

Appellees attempt to distinguish *Brown* by emphasizing that the plaintiff asserted standing only as a voter, whereas appellees claim standing as voters *and* sponsors of Prop. 2. Therefore, appellees argue their position is similar to the status of the *Glass* and *Blum* plaintiffs.

We acknowledge the *Brown* court specifically noted that the plaintiff asserted standing as a voter—not as a petition organizer and signer. *Id.* at 302 n. 2. However, the court then discussed the effect of

---

7. A City Council member also sued the City, and the court evaluated whether he had standing. *See Brown*, 53 S.W.3d at 299, 304– 06. But, only the issue concerning standing of the private citizen is relevant to the present case.

sponsorship activities on the standing issue. *See id.* at 302–03.[8] The court recognized the *Glass* and *Blum* plaintiffs had standing because they challenged the *process* relative to their sponsored referendum. *See id.* As petition signers, they possessed a particular interest in ensuring their proposed ordinances were submitted to the electorate and properly worded on the ballot. *See id.* (explaining *Glass,* 244 S.W.2d at 648; *Blum,* 997 S.W.2d at 262, 264).

However, the *Brown* court distinguished a challenge to the election *process* from a claim concerning the election *results,* stating it has never recognized standing on the basis of the results—as opposed to the process—of an initiative election. *Id.* at 302. Significantly, the court stated, "*Blum* and *Glass* are narrow holdings, affording petition signers the right to challenge the referendum *process* but saying nothing about *the right to protect the referendum results from subsequent changes.*" *Id.* at 303 (emphasis added). Further, the court remarked that *Blum* and *Glass* were consistent with the judiciary's limited role in election disputes, which provides a remedy to undo elections tainted by fraud, illegality, or other irregularity. *Id.*

Accordingly, the *Brown* court did not directly address the standing afforded a referendum sponsor with respect to the results of an election. *See id.* at 302–04. However, the court did indicate that a referendum sponsor's standing is limited to challenging the election process and does not extend to protecting the results from subsequent change. *See id.* Appellees do not cite, and we have not found, any authority since *Brown,* in which the Texas Supreme Court has extended the standing afforded referendum sponsors by allowing them to protect the election results from subsequent change. In fact, when granting appellees' mandamus petition, the First Court of Appeals cited *Brown* as recognizing "*Blum* and *Glass* stand for the proposition that petition signers have standing to challenge the referendum process, although they do not have standing to challenge the results of the election." *Robinson,* 175 S.W.3d at 827 (citing *Brown,* 53 S.W.3d at 301).[9]

■ Therefore, in light of *Brown,* the parties dispute whether appellees' claim concerns the election process or results. We conclude that appellees' claim cannot be characterized as a challenge to the election process. Because Prop. 2 was passed, obviously appellees would not challenge the process and argue it was tainted by fraud, illegality, or other irregularity. Clearly, appellees are completely satisfied with the election process because they achieved their objective: Prop. 2 was submitted to the electorate; voters passed the proposition; and it was certified and adopted.[10]

---

8. Although the plaintiff claimed standing only as a voter, he was indeed a sponsor of the referendum because he and others organized a campaign and petitioned the City to repeal the anti-discrimination ordinance. *See Brown,* 53 S.W.3d at 299.

9. Appellees also attempt to distinguish *Brown* because the Mayor's executive order, which allegedly nullified voters' rejection of the anti-discrimination ordinance, occurred thirteen years after the election. *See Brown,* 53 S.W.3d at 299. However, the court did not indicate this passage of time influenced its statement that the court has never recognized standing of referendum sponsors or voters to protect election results from subsequent change. *See id.* at 302–04. Therefore, despite this substantial passage of time between the election and the Mayor's action, we find *Brown* is persuasive in this case.

10. When granting appellees' mandamus petition, the First Court of Appeals recognized they had standing to compel the City to perform its ministerial acts of certifying the election results and recording adoption of Prop. 2 in the city records because appellees chal-

Rather, appellees are attempting to protect the election results from subsequent change by the City. As appellees acknowledge at one point in their brief, they "are not in any way contesting the validity of the election. Instead, Appellees are arguing that [the City's] interpretation and implementation of the election *results* is completely inaccurate and illegal." (emphasis added).[11] In short, this dispute has moved beyond the election process. The City's ministerial duties with respect to the election process are complete. Instead, appellees now challenge the City's decision-making relative to its construction of two adopted propositions (Prop. 1 and Prop. 2) and its refusal to enforce one such proposition (Prop.2).[12]

Arguably, appellees have a greater interest in enforcement of Prop. 2 than other voters. Additionally, we recognize appellees' efforts to place Prop. 2 on the ballot and obtain passage seem futile if the City ultimately refuses to enforce the proposition. As the *Brown* dissenting author questioned, "what use is an interest in an election's process without a corresponding interest in enforcing the results?" *Brown,* 53 S.W.3d at 307 (Enoch, J., concurring

and dissenting).[13] Nonetheless, the majority opinion in *Brown* supports a conclusion that referendum sponsors, and voters, lack standing to challenge the City's construction of, and refusal to enforce, an adopted proposition after the election is complete. *See id.* at 302–04.

Moreover, under the standing criteria imposed by our courts, we do not focus solely on whether the claimant asserts a particular interest; rather, we consider whether the claimant alleges a distinct injury caused by the defendant's actions. *See Lomas,* 223 S.W.3d at 307; *Williams,* 52 S.W.3d at 178–79; *Brown,* 53 S.W.3d at 302; *Concerned Cmty.,* 209 S.W.3d at 670. Because Prop. 2 was submitted to the electorate and passed by voters and adoption was reflected in the city records, appellees have not alleged any distinct injury by virtue of their sponsorship activities. Instead, appellees are now essentially equal to all other persons who voted for Prop. 2 and wish to ensure it is subsequently enforced. In a broader sense, appellees are now equal to all City taxpayers, or even citizens, who wish to ensure Prop. 2 is enforced because they might be affected by its terms. Therefore, appellees have

---

lenged the process, not the results, of the election. *See Robinson,* 175 S.W.3d at 828. Thus, the court stated that appellees had a particular interest in seeking to have a proposition they "sponsored" enacted as law once it was adopted by citizens in a referendum election. *Id.* However, the court did not consider whether appellees had standing to challenge the City's determination that Prop. 2 is invalid and its refusal to enforce the proposition once adopted. *See id.* at 826–32.

**11.** Appellees make somewhat inconsistent arguments. On one hand, appellees argue they satisfy the concept affording standing to petition signers challenging the election process. On the other hand, in response to the City's separate argument that appellees were required to file an election contest, appellees make the above-quoted statement, insisting

they are not challenging the election process. In fairness to appellees, the City also makes somewhat inconsistent arguments by contending appellees were required to file an election contest, while claiming this dispute involves the election results. Regardless of these inconsistent arguments, we conclude this dispute concerns the election results-not the process.

**12.** As we have explained, the City refuses to enforce Prop. 2 based on its construction of Prop. 2 in conjunction with Prop.1.

**13.** The *Brown* dissenting author opined that the plaintiff possessed standing, as referendum sponsor and voter, to challenge the Mayor's action nullifying the previous election results. *See* 53 S.W.3d at 306–08 (Enoch, J., concurring and dissenting).

not claimed an injury caused by the City's refusal to enforce Prop. 2 that is distinct from the injury, if any, suffered by other voters, taxpayers, or citizens.

In sum, appellees have not demonstrated they possess standing under the common-law standard. We sustain the City's second issue.

## B. The Language of Prop. 2

■ Alternatively, in their live pleadings, appellees allege they have standing based on the following provision in Prop. 2:

Any person who voted in a City of Houston election held on this Amendment shall have the right and standing to enforce the provisions of any Charter Amendment approved by the voters at this election by injunction, declaratory judgment, contempt and/or any other remedy provided by law, notwithstanding any other valid law of equal or lesser authority in conflict, including all of the above paragraphs of this Amendment.

Appellees cite authority recognizing that citizens who exercise their petition and referendum rights "act as and 'become in fact the legislative branch of the municipal government.'" *Blum*, 997 S.W.2d at 262 (quoting *Glass*, 244 S.W.2d at 649). Therefore, appellees contend the above-cited provision is analogous to a statutory conferral of standing by the Texas Legislature. For several reasons, we disagree that this provision is valid as a statutory conferral of standing.

■ Appellees correctly assert the Texas Legislature may confer standing through a statute. *See Scott v. Bd. of Adjustment*, 405 S.W.2d 55, 56–7 (Tex. 1966); *Sullivan*, 157 S.W.3d at 915; *see also Williams*, 52 S.W.3d at 178–79; *Hunt*,

664 S.W.2d at 324. The "judge-made criteria" for determining standing do not apply when the Legislature has conferred standing through a statute. *Sullivan*, 157 S.W.3d at 915.[14] However, citizens exercising their petition and referendum rights act as the legislative body of a *municipal* government—not the *Texas Legislature*. *See Blum*, 997 S.W.2d at 262. Appellees cite no cases in which the Texas Supreme Court, or any other court, has expanded statutory standing to incorporate municipal referendum sponsors seeking to confer standing through a proposition.

■ Further, as we have mentioned, the requirement of standing derives from constitutional principles: the separation-of-powers doctrine, prohibiting courts from issuing advisory opinions deciding abstract questions of law without binding the parties; and, in Texas, the open-courts provision, which contemplates access to the courts for only those litigants who have suffered an actual, as opposed to a general or hypothetical, injury. *Lomas*, 223 S.W.3d at 307 (citing *Brown*, 53 S.W.3d at 302; *Tex. Ass'n of Bus.*, 852 S.W.2d at 443–44). Statutory conferral of standing by the Texas Legislature is an *exception* to the general criteria for determining standing. *See Hunt*, 664 S.W.2d at 324; *see also Williams*, 52 S.W.3d at 178–79; *Sullivan*, 157 S.W.3d at 915. We decline to create a further exception concerning a requirement grounded in constitutional principles when the Texas Supreme Court has not done so.

In addition, appellees filed this suit in state district court. The City argues that a *city* government has no authority to dictate the existence of subject matter jurisdiction, including standing, in a *state*

14. Instead, the analysis is a straight construction of the relevant statute to determine upon whom the Legislature conferred standing and whether the claimant falls in that category. *Sullivan*, 157 S.W.3d at 915.

district court. The City cites *Berry v. City of Fort Worth*, in which a municipal ordinance, defining the method for service of process in a civil action arising out of a violation, conflicted with general Texas law governing service of process. *See* 132 Tex. 599, 124 S.W.2d 842, 846 (1939). The supreme court recognized that a trial court obtains personal jurisdiction over a defendant in a civil action via service of process. *See id.* Therefore, the court held that the pertinent portion of the ordinance was invalid because a city government lacked power to define how Texas civil courts obtain personal jurisdiction over a defendant. *See id.* Likewise, *Berry* supports a conclusion that a municipal government—whether the city council or referendum sponsors acting as the legislative branch—lacks power to dictate existence of subject matter jurisdiction, including standing, in a state district court.

In response, appellees cite Article IX, Section 1 of the Houston City Charter which provides, in pertinent part:

> Any citizen who is a property tax-payer of the City of Houston may maintain an action in the proper court to restrain the execution of any illegal, unauthorized or fraudulent contract or agreement on behalf of said City, and to restrain any disbursing officer of said City from paying any illegal, unauthorized or fraudulent bills, claims or demand against said City, or any salaries or compensation to any person in its administrative service whose appointment has not been made in pursuance of the provisions of law and the regulations in force thereunder. . . .

■ ■ According to appellees, this provision indicates that a city government may confer standing, even in state district court. However, this provision is fairly consistent with a long-established, limited exception to the typical standing criteria. Specifically, a taxpayer has standing to sue in equity to enjoin the illegal expenditure of public funds without showing a distinct injury. *Williams*, 52 S.W.3d at 179; *Bland*, 34 S.W.3d at 555–56; *see Lomas*, 223 S.W.3d at 307–08; *Osborne v. Keith*, 142 Tex. 262, 177 S.W.2d 198, 200 (1944). This exception encompasses a taxpayer's right to enjoin expenditure of public funds under a void or illegal contract. *Osborne*, 177 S.W.2d at 200; *see Lomas*, 223 S.W.3d at 307–08; *Bland*, 34 S.W.3d at 555–58.[15]

In contrast, the standing provision in Prop. 2 alters the established criteria for determining standing in a state district court. The provision confers standing to enforce Prop. 2 on any person who voted in the election, without requiring the voter to assert a distinct injury. However, the provision conflicts with *Brown*, in which the court held that a voter lacked standing to protect the results of an election from future action by the City because he could *not* allege a sufficiently distinct injury. *See* 53 S.W.3d at 302–04. Consequently, we decline to recognize a standing provision in a citizen-initiated, municipal proposition when enforcement would circumvent a holding of our supreme court.

Moreover, it is one matter for the City to prescribe that it may be sued by taxpayers relative to certain issues. It is quite another matter for referendum sponsors, notwithstanding their role as the City's "legislative body," to prescribe that they,

---

15. Usually, to possess standing to contest government decision-making, a taxpayer must show he has suffered a particularized injury distinct from one sustained by the general public because " '[g]overnments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review.' " *Bland*, 34 S.W.3d at 555–56 (quoting *Osborne*, 177 S.W.2d at 200).

and others, may sue the City. In this regard, the City's ability to govern effectively might be seriously hampered if referendum sponsors were allowed to confer standing on persons simply by including a provision in a proposition.

For instance, if the standing provision at issue were valid, 567, 331 persons who voted in the election at issue could sue the City over its refusal to initially implement the adopted proposition. Further, the provision is somewhat vague because it gives voters "standing to enforce the provisions of" Prop. 2. Arguably, if this provision were valid, voters could also challenge the City's actions in every future budget cycle to ensure compliance with Prop. 2. Consequently, enforcing this provision would potentially subject the City's decision-making to numerous, unlimited challenges by persons who can claim no distinct injury therefrom. We reject appellees' suggestion that the distinct-injury requirement imposed by our courts may be so easily circumvented by inclusion of a standing provision in a citizen-initiated proposition.

Finally, appellees' reasoning relative to the standing provision in Prop. 2 is circular. In short, enforcing the standing provision would entail a determination that Prop. 2 is valid-the dispute in this litigation. But, a court cannot declare Prop. 2 valid unless appellees first establish standing. Appellees maintain the standing provision is nonetheless effective because the City entered an order in its records reflecting Prop. 2 was adopted by voters. Local Government Code section 9.005(b) provides that an amendment does not take effect *until* the governing body enters the prescribed order reflecting adoption by voters. Tex. Loc. Gov't Code Ann. § 9.005(b). However, section 9.005(b) does not mandate that the amendment is necessarily valid upon entry of the order. *See*

*id.* Indeed, when compelling the City to enter the prescribed order, the First Court of Appeals acknowledged that issues remained regarding validity of Prop. 2. *See Robinson,* 175 S.W.3d at 830–32. Although the City performed this ministerial act to complete the election process, validity of Prop. 2 is disputed. Consequently, even if a standing provision in a citizen-initiation proposition were analogous to statutory conferral of standing by the Texas Legislature, we cannot conclude that the statutory-standing principle applies in the present situation.

In sum, appellees do not have standing based on the above-cited provision in Prop. 2. We sustain the City's third issue.

### III. CONCLUSION

In sum, appellees have failed to demonstrate they possess standing under common-law rules or the above-cited provision in Prop. 2. Therefore, the trial court erred by denying the City's plea to the jurisdiction. The City requests that we reverse the trial court's judgment and order dismissal of appellees' suit for lack of jurisdiction. Instead, we conclude that remand is the appropriate disposition.

If a plaintiff fails to plead sufficient facts affirmatively demonstrating the trial court's jurisdiction, but the pleadings do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *Miranda,* 133 S.W.3d at 226–27; *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002). However, if the pleadings affirmatively negate the existence of jurisdiction, a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Miranda,* 133 S.W.3d at 226; *Brown,* 80 S.W.3d at 555. The Texas Supreme Court recently recognized that the opportunity to

amend pleadings that are insufficient to establish, but do not affirmatively negate, jurisdiction arises once a court determines the pleadings are insufficient. *See Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839–40 (Tex.2007). In particular, a plaintiff deserves the opportunity to amend his pleadings, if the defects are curable, when an appellate court determines a plea to the jurisdiction should have been sustained. *See id.*[16]

In this case, although appellees have failed to establish standing, their pleadings do not affirmatively negate standing. We cannot foreclose the possibility that appellees may allege other facts demonstrating standing. Therefore, appellees are allowed a "reasonable opportunity" to amend their pleadings before the trial court's final disposition of the City's plea to the jurisdiction.

Accordingly, we reverse the trial court's final judgment and remand for further proceedings consistent with the opinion.

---

**16.** Until recently, some disagreement existed among courts regarding the point at which a plaintiff must be afforded an opportunity to amend. *See Tex. A & M Univ. Sys. v. Koseoglu*, 167 S.W.3d 374, 380–84 (Tex.App.-Waco 2005), *rev'd in part*, 233 S.W.3d 835 (Tex. 2007) (explaining various approaches of courts). Under one view, a plaintiff was allowed an opportunity to amend his pleadings after a court determined they were insufficient to establish jurisdiction. *See id.* Other courts indicated that the opportunity to amend arose after a defendant filed its plea to the jurisdiction notifying the plaintiff of alleged defects, but before the trial court ruled on the plea. *See id.* Under this reasoning, a plaintiff who actually amended his pleadings after the defendant filed its plea to the jurisdiction could be denied further opportunity to

amend even if the court sustained the plea. *See id.* The Texas Supreme Court recently clarified the applicable standard: " 'a plaintiff may stand on his pleadings in the face of a plea to the jurisdiction *unless and until* a court determines that the plea is meritorious.' ... [t]hereafter ... the plaintiff must be given 'a reasonable opportunity to amend his pleadings to attempt to cure the jurisdictional defects *found*' unless the pleadings are incurably defective." *See Koseoglu*, 233 S.W.3d at 839 (quoting lower court, *Koseoglu*, 167 S.W.3d at 383, and expressly agreeing with its statement) (emphasis added). The court rejected the opposite view because that "proposed rule would essentially allow governmental entities the unjust advantage of being not only a litigant, but also the judge of the plaintiff's pleadings." *Id.* at 839–40.