Sylvester TURNER, in His Official Capacity as Mayor of the City of Houston, and the City of Houston, Appellants

v.

Carroll G. ROBINSON, Bruce R. Hotze and Jeffrey N. Daily, Appellees

NO. 14-16-00393-CV

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed August 17, 2017.

Rehearing Denied November 2, 2017

---

Judith Lee Ramsey, Patricia L. Casey, Houston, Kathleen Hopkins Alsina, for Appellants.

Andy Taylor, Houston, Amanda Eileen Staine Peterson, Houston, for Appellees.

Panel consists of Justices Busby, Donovan, and Brown

## OPINION

John Donovan, Justice

Litigation of the matter underlying this case began in 2004. In its current form, Carroll G. Robinson, Bruce R. Hotze, and Jeffrey N. Daily[1] filed suit in April 2014 against Annise D. Parker, as Mayor of the City of Houston,[2] and the City of Houston (collectively "the City"), seeking declaratory and injunctive relief. The City subsequently filed a plea to the jurisdiction and, subject to the plea, a motion for summary judgment. Both were denied by the trial court in an order signed May 2, 2016. From the denial of its plea, the City brings this appeal. The City contends appellees lack standing to bring this suit and governmental immunity has not been waived as to either the City of Houston or the Mayor. We conclude appellees have standing as taxpayers and the City has not conclusively proved the trial court lacks subject matter jurisdiction. We therefore affirm the trial court's order.

## BACKGROUND

The City approved an ordinance placing two propositions for amendments to the city charter on the ballot in a November 2004 election: "Prop. 1" and "Prop. 2."[3]

1. Although counsel informed this court at oral argument that Jeffrey N. Daily had died, no suggestion of death was filed. In light of that, we have not removed his name from the style of this case.

2. We substitute Sylvester Turner, in his official capacity, as successor to Annise D. Par-

ker as Mayor of the City of Houston. *See* Tex. R. App. P. 7.2(a). The opinion will simply refer to the "Mayor."

3. "Prop. 3," relating to the City Controller's role in performing internal audits, was also

Prop. 1 was placed on the ballot pursuant to the City's own motion. Prop. 1 pertains to "Limits on Annual Increases in City Property Taxes and Utility Rates." Prop. 1 grants the City "full authority to assess and collect any and all revenues of the city without limitation, except as to ad valorem taxes and water and sewer rates." Although the full text of Prop. 1 was set forth in the election ordinance, the following summary was included on the ballot:

> The Charter of the City of Houston shall be amended to require voter approval before property tax revenues may be increased in any future fiscal year above a limit measured by the lesser of 4.5% or the cumulative combined rates of inflation and population growth. Water and sewer rates would not increase more than the cumulative combined rates of inflation and population growth without prior voter approval. The Charter Amendment also requires minimum annual increases of 10% in the senior and disabled homestead property tax exemptions through the 2008 tax year.

Prop. 2 resulted from a citizen-initiated referendum petition. Prop. 2 concerns "Limits on All Combined City Revenues." Although the full text of Prop. 2 was set forth in the election ordinance, the following summary was included on the ballot:

> The City Charter of the City of Houston shall be amended to require voter approval before the City may increase total revenues from all sources by more than the combined rates of inflation and population, without requiring any limit of any specific revenue source, including water and sewer revenues, property taxes, sales taxes, fees paid by utilities and

developers, user fees, or any other sources of revenues.

On the November 2004 ballot, the electorate was allowed to vote for or against each proposition. Prop. 1 and Prop. 2 each passed with a majority of the votes cast on the particular proposition. Prop. 1 received more favorable votes than Prop. 2.

After the election, for two independent reasons, the City determined Prop. 1 is legally binding and Prop. 2 would not be enforced. First, in the election ordinance, the following "poison pill" provision was included after the text of Prop. 1:

> If another proposition for a Charter amendment relating to limitations on increases in City revenues is approved at the same election at which this proposition is also approved, and if this proposition receives the higher number of favorable votes, then this proposition shall prevail and the other shall not become effective.

Citing this provision, the City asserted Prop. 1 must prevail because it received more favorable votes than Prop. 2. Alternatively, the City relied on Article IX, Section 19 of the Houston City Charter providing, in pertinent part:

> ... at any election for the adoption of amendments if the provisions of two or more proposed amendments approved at said election are inconsistent the amendment receiving the highest number of votes shall prevail.

The City posited that Prop. 1 and Prop. 2 are inconsistent and Prop. 1 prevails because it received more favorable votes.[4]

included on the ballot, but this proposition is not at issue in this suit.

4. As the City notes, enforcement of only Prop. 1 pursuant to the "poison pill" provision does not require an inconsistency between Prop. 1

and Prop. 2. In contrast, Article IX, Section 19 of the city charter requires that amendments approved at the same election be inconsistent before the one receiving more votes must prevail.

In a prior case, appellees sued the City, seeking a declaratory judgment that Prop. 1 and Prop. 2 must both be added to the City Charter. The City filed a plea to the jurisdiction, followed by a supplemental plea, contending, inter alia, that appellees lacked standing. The City also filed a motion for summary judgment and a supplemental motion. The trial court denied the City's plea to the jurisdiction and motion for summary judgment. Subsequently, the trial court denied the City's request for reconsideration of its motion for summary judgment. Appellees also filed a motion for summary judgment which the trial court granted. The trial court then signed a final judgment from which the City appealed. The trial court specifically expressed no opinion on the validity of Prop. 2. That issue was presented in the City's appeal to this court but was not reached. *See White v. Robinson*, 260 S.W.3d 463 (Tex. App.—Houston [14th Dist.] 2008), *vacated sub nom. Robinson v. Parker*, 353 S.W.3d 753 (Tex. 2011). We held appellees lacked standing to challenge the City's post-election interpretation of the two propositions based on their working to place the proposition on the ballot, contributing to the campaign for the proposition, and voting for Proposition 2. *Id.* at 473. We remanded the case to the trial court to allow appellees an opportunity to replead and establish standing. *Id.* at 476.

Appellees appealed our decision to the Texas Supreme Court where our judgment was vacated and the case dismissed on the grounds the claims were not ripe. *See Robinson v. Parker*, 353 S.W.3d 753, 756 (Tex. 2011). The court noted the record was silent as to whether the City had failed to comply with the Prop. 2 spending caps and that then-mayor Bill White had stated his intention to comply with the caps. *Id.* at 755–56. Because there was nothing in the record indicating the City had actually failed or would soon fail to comply with Prop. 2's spending caps, the case was not ripe and the trial court lacked jurisdiction. *Id.* at 756.[5] Accordingly, the judgments of our court and the trial court were vacated and the case dismissed for want of jurisdiction. *Id.* The court expressly declined to opine as to whether, if the case were ripe, appellees would have standing to bring their declaratory judgment claims. *Id.*

On the same day that suit was filed, appellees sought writs of mandamus that were assigned to the First Court of Appeals complaining that the City failed to perform certain ministerial duties with respect to the election. *See In re Robinson*, 175 S.W.3d 824, 826–27 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding). The court held the Mayor had a non-discretionary duty to certify all the amendments, including Prop. 2, to the Secretary of State. *Id.* at 829–30 (citing Tex. Loc. Gov't Code Ann. § 9.007(a) (West 2008)).[6] The court also held that City Council had a non-discretionary duty to enter an order in the city records declaring all the propositions had been adopted by voters. *Id.* at 830–32 (citing Tex. Loc. Gov't Code Ann. § 9.005 (West 2008)).[7] The city council

---

5. As set forth in more detail below, the current pleadings, on the other hand, allege appellants "have passed budgets and have assessed, collected and spent, public funds which exceed [the caps of Prop.1 and Prop. 2] for each of [fiscal year] 2011 until [fiscal year] 2017."

6. *See* Tex. Loc. Gov't Code Ann. § 9.007(a) (West 2008) ("As soon as practicable after a municipality adopts a charter or charter amendment, the mayor or chief executive officer of the municipality shall certify to the secretary of state an authenticated copy of the charter or amendment under the municipality's seal showing the approval by the voters of the municipality.").

7. *See* Tex. Loc. Gov't Code Ann. § 9.005 (West 2008) ("(a) A proposed charter for a municipality or a proposed amendment to a municipality's charter is adopted if it is ap-

passed an ordinance recognizing that both Prop. 1 and Prop. 2 had passed, thus both propositions became part of the Houston City Charter, and declaring that Prop. 1 had received the higher number of votes. *See Robinson*, 353 S.W.3d at 754 (citing Hous., Tex., Code Ordinances, City Charter art. III, § 1; art. VI-a, § 7; art. IX, § 20 (2006)).

In July 2008—our opinion in *White v. Robinson*, 260 S.W.3d 463, issued in April 2008—Hotze petitioned this court for a writ of mandamus to compel the city to furnish written verification that its budget complied with the city charter. *In re Hotze*, 14-08-00421-CV, 2008 WL 4380228 (Tex. App.—Houston [14th Dist.] July 10, 2008, no pet.) (mem. op.). We determined Hotze lacked standing under section 273.061 of the Election Code. We did not address Hotze's claim that he had taxpayer standing because the petition did not

invoke our limited jurisdiction to compel an action by a district or county court or to enforce this court's jurisdiction. *Id.* (citing Tex. Gov't Code § 22.221).

Also during this time, the Mayor and the City Council approved putting two new propositions, Propositions G and H, on the November 7, 2006, ballot. Proposition G revised the calculation for the city charter's limitations on the City's revenues.[8] Proposition H permitted the City to raise revenues for police, fire, and emergency services in excess of the revenues allowed under any revenue limitations contained in the city charter.[9]

On November 3, 2006, Hotze filed a declaratory judgment action against the City seeking a declaration that Proposition G, as it was to appear on the ballot in the November 7, 2006 election, was "illegal and invalid as a matter of law." *See* Tex.

**8.** Proposition G read as follows:

Exclusions from limits on City revenues.

(a) Revenues of enterprise funds are not included in revenues limited by this Charter. The preceding provisions do not affect Charter limitations on the growth of property taxes or water and sewer rates contained in Article III, Section 1, and Article IX, Section 20, of this Charter.

Enterprise funds (e.g. the Airport System) are all those largely self-sufficient activities not funded with property tax revenues. To maintain the self-sufficiency of the Water and Sewer System, the revenues of that System can only be used for the purposes of that System, and limited drainage purposes, as set forth in the existing debt covenants of that System. Those revenues cannot be used for any other purpose.

(b) For the purposes of calculating any revenue limitation in this Charter, amounts resulting from termination of or reduced participation in a tax increment reinvestment zone shall be treated in the same manner as revenues from annexed areas in Article III, Section 1.

(c) City Council may prescribe methods for complying with limits on revenues in this Charter to account for changes in accounting standards or practices.

**9.** Proposition H read as follows:

To pay for the public safety needs of an increased population, the City of Houston may collect revenues of $90 million for police, fire and emergency medical services and related communications and dispatch costs, so long as the Fiscal Year 2007 (Tax Year 2006) combined property tax rate is at or below the combined property tax rate in Fiscal Year 2006 (Tax Year 2005), notwithstanding any applicable revenue limitations in the Charter. Any amount collected under this authority must be spent on police, fire and emergency medical services and related communications and dispatch costs. This amount shall be added to any applicable revenue limitations in Fiscal Year 2007 (Tax Year 2006) and any base used to calculate revenue limitations in following budget years.

Elec. Code §: 221.002, 233.006(a)-(b). The City subsequently filed a Plea to the Jurisdiction, and then an Amended Plea to the Jurisdiction, arguing that the trial court did not have subject matter jurisdiction over this action because Hotze's claims were time-barred by the Texas Election Code. *Id.* The trial court granted the City's amended plea to the jurisdiction as to all of Hotze's claims.

Hotze appealed. *Hotze v. White*, 01-08-00016-CV, 2010 WL 1493115, at *2–3 (Tex. App.—Houston [1st Dist.] Apr. 15, 2010, pet. denied) (mem. op.). The First Court of Appeals held the trial court lacked subject matter jurisdiction to hear any claims challenging the facial validity of Propositions G and H on the ballot and Hotze lacked standing to maintain his suit. *Id.* at *5-7. The court reversed the trial court's judgment and remanded to allow Hotze' an opportunity to re-plead. *Id.* at *8.

Appellees subsequently filed the suit underlying this appeal requesting a declaratory judgment and injunctive relief regarding the validity of Prop. 2 and the City's future compliance with both Prop. 1 and Prop. 2. The trial court denied the City's plea to the jurisdiction and this appeal ensued. The City claims the trial court erred in denying the plea for two reasons: appellees lack standing and appellants' immunity has not been waived. After setting forth the proper standard of review, we address each in turn.

## STANDARD OF REVIEW

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) Whether a court has subject matter jurisdiction is a question of law. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). Whether a party has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction and whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction are questions of law reviewed de novo. *Miranda*, 133 S.W.3d at 226. However, in some cases, disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact. *Id.* (citing *Gates v. Pitts*, 291 S.W. 948, 949 (Tex. Civ. App.—Amarillo 1927, no writ)).

When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Miranda*, 133 S.W.3d at 226 (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 446). We construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. *Miranda*, 133 S.W.3d at 226–27 (citing *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002)). If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.* at 227.

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *Miranda*, 133 S.W.3d at 227 (citing *Bland*, 34 S.W.3d at 555). In a case in which the jurisdictional

challenge implicates the merits of the plaintiff's cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists. *Id.* If the relevant evidence is undisputed or fails to raise a fact question, the trial court rules on the plea as a matter of law. *Id.* at 228.

The standard of review for a plea to the jurisdiction based on evidence "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Miranda,* 133 S.W.3d at 228; *see also Thornton v. Ne. Harris Cty. MUD 1,* 447 S.W.3d 23, 32 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Under this standard, we take as true all evidence favoring the non-movant and draw all reasonable inferences and resolve any doubts in the non-movant's favor. *Miranda,* 133 S.W.3d at 228. If the movant presents conclusive proof that the trial court lacks subject matter jurisdiction, then the non-movant must present evidence sufficient to raise a material issue of fact regarding jurisdiction, or the plea will be sustained. *See id.; City of Galveston v. Murphy,* No. 14-14-00222-CV, 533 S.W.3d 355, 358–59, 2015 WL 167178, at *2 (Tex. App.—Houston [14th Dist.] Jan. 13, 2015, pet. denied).

## STANDING

In their first issue, the City contends appellees lack standing to bring their claims. In their petition, appellees asserted standing by virtue of their participation in the passage of Prop. 2, that Prop. 2 confers standing on them, and they have standing as taxpayers. We first address the question of taxpayer standing.

Standing is a constitutional prerequisite to maintaining suit. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 646 (Tex. 2004) (citing *Tex. Ass'n of Bus.,* 852 S.W.2d at 444). Standing is determined at the time suit is filed in the trial court. *See Tex. Ass'n of Bus.,* 852 S.W.2d at 446 n. 9 (citing *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir. 1991)); *see also Kitty Hawk Aircargo, Inc. v. Chao,* 418 F.3d 453, 458 (5th Cir. 2005) (standing determined as of commencement of suit). Except for issues involving mootness, subsequent events do not deprive the court of subject matter jurisdiction. *See Texas Ass'n of Bus.,* 852 S.W.2d at 446 n. 9. As a general rule, unless standing is conferred by statute, a plaintiff must demonstrate that he possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury. *Williams v. Lara,* 52 S.W.3d 171, 178–79 (Tex. 2001) (citing *Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex. 1984)).

Taxpayers, however, fall under a limited judicial exception to this general rule. *Williams,* 52 S.W.3d at 179–80 (citing *Bland,* 34 S.W.3d at 556); *see also Lone Star Coll. Sys. v. Immigration Reform Coal. of Tex. (IRCOT),* 418 S.W.3d 263, 274 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Taxpayers in Texas generally have standing to enjoin the illegal expenditure of public funds and need not demonstrate a particularized injury. *Williams,* 52 S.W.3d at 179; *Bland,* 34 S.W.3d at 556; *Calvert v. Hull,* 475 S.W.2d 907, 908 (Tex. 1972); *Osborne v. Keith,* 142 Tex. 262, 177 S.W.2d 198, 200 (Tex. 1944). Implicit in this rule are two requirements: (1) that the plaintiff is a taxpayer; and (2) that public funds are being expended on the allegedly illegal activity. *Williams,* 52 S.W.3d at 179; *Bland,* 34 S.W.3d at 556; *Calvert,* 475 S.W.2d at 908; *Osborne,* 177 S.W.2d at 200. A taxpayer may maintain an action solely to challenge proposed illegal expenditures; he or she may not sue to recover funds previously expended or challenge expendi-

tures that are merely "unwise or indiscreet." *Williams*, 52 S.W.3d at 180 (citing *Hoffman v. Davis*, 128 Tex. 503, 100 S.W.2d 94, 96 (Tex. 1937), and *Osborne*, 177 S.W.2d at 200). Underpinning these limitations is the realization that "governments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review." *Id.* (quoting *Osborne*, 177 S.W.2d at 200, and citing *Bland*, 34 S.W.3d at 555). As a component of subject-matter jurisdiction, we review a claimant's standing de novo. *City of Sunset Valley*, 146 S.W.3d at 646; *Texas Ass'n of Bus.*, 852 S.W.2d at 445.

By their suit, appellees' do not seek to recover funds previously expended but to restrain future collection and spending of illegal taxes and reimbursement of illegally collected, but unspent, taxes. In *Calvert v. Hull*, 475 S.W.2d 907, 908 (Tex. 1972), the Texas Supreme Court found plaintiffs had taxpayer standing to seek injunctive and declaratory relief. The *Calvert* court relied upon *Terrell v. Middleton*, 187 S.W. 367, 369 (Tex. Civ. App.—San Antonio 1916), writ denied, 108 Tex. 14, 191 S.W. 1138 (1917), which held "[c]itizens are allowed to prevent, by injunction, the collection of illegal taxes." *Terrell* was "the famous 'chicken salad' case wherein private citizens were held to have standing to sue the State Comptroller, Middleton, to enjoin the expenditure of appropriated funds to pay for chicken salad and other items of 'public' entertainment at the mansion by Governor Colquitt." *Calvert*, 475 S.W.2d at 908. At the time, "[t]he constitution then read that the governor should receive annually $4,000 'and no more.' The chicken salad expenditure was held to be an unconstitutional increase in the emolument of the governor." *Id.*

Similarly, in this case, appellees seek injunctive and declaratory relief to prevent the future collection and expenditure of funds in excess of the caps imposed by the passage of Prop. 1 and Prop. 2. In accordance with *Terrell* and *Calvert*, we conclude appellees have standing as taxpayers and overrule the City's third issue. It is therefore unnecessary to address the City's first and second issues challenging appellees' standing on other grounds.

### Immunity

Sovereign immunity protects the State and its political subdivisions from lawsuits for damages unless immunity has been waived by the Legislature. *Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). Sovereign immunity from suit deprives a trial court of subject matter jurisdiction and is properly asserted in a plea to the jurisdiction. *Reata*, 197 S.W.3d at 374; *Miranda*, 133 S.W.3d at 225–26. However, the Texas Supreme Court has recognized that sovereign immunity does not bar a suit in at least two relevant circumstances: (1) when the suit seeks to determine or protect a party's rights against a government official who has acted without legal or statutory authority—commonly referred to as an *ultra vires* claim; or (2) when the suit challenges the validity of a statute.

In their second amended petition, appellees assert the Mayor is not immune from suit under the first circumstance. Appellees further contend the City of Houston is not immune under the second circumstance because it is a necessary party under the Uniform Declaratory Judgments Act ("the Act"). Before addressing each of these arguments, we set forth appellees' claims.

## The Pleadings

Contained within appellees' petition are the following allegations:

- The Mayor allowed the City of Houston to assess and collect approximately $125 million each year (from 2011 until 2015), and has since allowed the City of Houston to assess and collect approximately $175 million each year (from January 1, 2016 until the present time);
- The Mayor has publicly announced his intention to continue to assess and collect drainage fees in the future;
- the City has refused to include any drainage charges in their calculation of whether any of the budgets passed from fiscal year ("FY") 2011 to FY 2017 exceed the caps of Proposition 1 or 2; and
- the City has passed budgets and have assessed, collected and spent, public funds which exceed these caps for each of FY 2011 until FY 2017.

As regards the Mayor's ultra vires acts, appellees allege the Mayor acted without legal authority in carrying out his duties:

- in permitting the illegal assessment, collection and expenditure of drainage fees,
- in exempting those drainage fees from the caps in Prop. 1 and Prop. 2;
- in passing budgets for FY 2011 to FY 2017 which exceed the caps and violate the other provisions of Prop. 1 and 2; and
- in expending public monies which exceed the caps in Prop. 1 and Prop. 2.

Appellees pleadings expressly state they are not seeking to recover public funds that have already been spent; reimbursement is only sought for monies that remain unspent. Appellees seek to prevent, through declaratory and injunctive relief:

- the assessment or collection of any future drainage charges;
- the passage of future budgets which exceed the Prop. 1 and Prop. 2 caps;
- the future spending of all collected drainage charges; and
- the future spending of drainage fees or other public monies for any and all annual budgets which fail to comply with Prop. 1 and Prop. 2.

Specifically, appellees' request the following declarations:

- The "poison-pill" language was not included in Prop. 1 and was never approved by the electorate;
- Alternatively, the "poison-pill" language is not a legitimate basis to create a conflict;
- Prop. 1 and Prop. 2 are not inconsistent;
- Prop. 1 and Prop. 2 are valid and constitutional; and
- Alternatively, if Prop. 1 and Prop. 2 are inconsistent, either Prop. 1 or Article IX, Section 19 of the City Charter are unconstitutional; and
- Alternatively, if Prop. 1 and Prop. 2 are inconsistent, and if neither Prop. 1 nor Article IX, Section 19 of the City Charter are unconstitutional, the portions of Prop. 1 and Prop. 2 that are not inconsistent stand.

We now consider whether the record before this court establishes the trial court erred in failing to find these claims against the Mayor and the City of Houston are barred by immunity.

### The Ultra Vires Exception

An ultra vires claim against a government official—that is, a suit against a government official for acting outside his or her authority and seeking to require the official to comply with statutory or consti-

tutional provisions—is not barred by sovereign immunity. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). To fall within the ultra vires exception, "a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* "The ultra vires suit seeks to enforce existing policy, not alter it." *Stiefer v. Moers*, No. 14-14-00617-CV, 2015 WL 6950104, at *3 (Tex. App.—Houston [14th Dist.] Nov. 10, 2015, no pet.) (mem. op.) (citing *Lone Star Coll. Sys. v. Immigration Reform Coalition of Tex. (IRCOT)*, 418 S.W.3d 263, 272 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing *Heinrich*, 284 S.W.3d at 372)). To meet the ultra vires exception to governmental immunity, a plaintiff must allege, and ultimately prove, that the officer either acted without legal authority or failed to perform a purely ministerial act. *Id.* An officer acts without legal authority if he "exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154 (Tex. 2016). The exception to immunity allows only prospective declaratory or injunctive relief, not retroactive relief. *Heinrich*, 284 S.W.3d at 374–77. "As *Heinrich* made clear, immunity for an ultra vires act is only a waiver with regard to bringing future acts into compliance with the law." *City of Galveston v. CDM Smith, Inc.*, 470 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (citing *Heinrich*, 284 S.W.3d at 374).

Appellees seek prospective relief to enforce Prop. 1 and Prop. 2, rather than retroactive relief. The pleadings do not claim the Mayor failed to perform a purely ministerial act but that the Mayor acted without legal authority. Appellees allege facts that, taken as true, and drawing all reasonable inferences and resolving any doubts in their favor, affirmatively demonstrate the trial court's jurisdiction to hear the cause. *See Miranda*, 133 S.W.3d at 226-28. In its brief, the City only provides one reference to the record in support of its argument that the acts alleged are not within the Mayor's purview. That reference is to Exhibit 2 of their plea which contains, from the City Charter, page one of Article VI-a and pages one and six of Article IX. Only the first of these three pages contain any reference to the Mayor and that is section 2, entitled Annual Budget, which provides it is the duty of the mayor to submit a budget to the City Council. The City's brief does not explain how this evidence conclusively negates appellees' allegations. *See Miranda*, 133 S.W.3d at 227–28. At best, it raises a fact question, under which circumstances the trial court *cannot* grant the plea. *Id.* at 227-28.

Appellees' pleadings allege the Mayor acted without legal authority. The City has not presented conclusive proof negating those allegations. Accordingly, the record before this court does not demonstrate the trial court erred in denying the plea to the jurisdiction as to the Mayor. Issue six is overruled.[10]

## The Uniform Declaratory Judgments Act

██ Under the Act, "[a] person ... whose rights, status, or other legal relations are affected by a statute, municipal ordinance, ... or franchise may have de-

---

10. In their fifth issue, the City claims the City of Houston's immunity is not waived for *ultra vires* claims against the Mayor. Because we understand appellees' pleadings as asserting a waiver of immunity for the City of Houston only in regards to their UDJA claims, it is unnecessary to address this issue.

termined any question of construction or validity arising under the ... statute, ordinance, ... or franchise and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code § 37.004. Thus, among other relief, a party may seek a declaratory judgment regarding the construction or validity of an ordinance. *See id.* When declaratory relief is sought, all "persons" who have or claim any interest that would be affected by the declaration must be made parties. Tex. Civ. Prac. & Rem. Code § 37.006(a). The term "person" as used in the Act expressly includes municipal corporations. *Id.* (stating that "[i]n this chapter, 'person' means an individual, partnership, joint-stock company, unincorporated association or society, or municipal or other corporation of any character"). The statute further contains an express waiver of sovereign immunity as follows:

> In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard.

Tex. Civ. Prac. & Rem. Code § 37.006(b). Thus the Act clearly and unambiguously waives the sovereign immunity of municipalities in any declaratory-judgment action involving the validity of a municipal ordinance. *Id.*

The City argues appellees are not challenging the validity of a municipal ordinance because they are seeking to have the ordinance declared to be valid, rather than invalid. The City has determined that Prop. 2 is not valid and therefore not enforceable. Appellees seek to have Prop. 2 declared valid but they are also challenging the validity of Prop. 1, specifically whether the "poison pill" language invalidates Prop. 2. Further, appellees alternatively plead the unconstitutionality of Prop. 1 and Article IX, Section 19 of the City Charter.

The court in *Tex. Dep't of Transp. v. Sefzik* recognized "the state may be a proper party to a declaratory judgment action that challenges the validity of a statute." 355 S.W.3d 618 (Tex. 2011) (citing *Heinrich*, 284 S.W.3d at 373 n. 6; Tex. Civ. Prac. & Rem. Code § 37.006(b); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697–98 (Tex. 2003); *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994)). The court determined Sefzik was not challenging the statute's validity, but TxDot's actions under it, and that he "[did] not direct [the court] to any provision of the UDJA that expressly waives immunity for his claim." *Id.*

Here, there is a provision of the Act that expressly waives a municipality's immunity for a declaratory-judgment action involving the validity of a municipal ordinance. And while appellees are challenging actions taken under the ordinances, they also seek a declaration as to their validity. We must construe the pleadings liberally in favor of appellees. *Miranda*, 133 S.W.3d at 226. In that light, we conclude the City of Houston's sovereign immunity as to appellees' declaratory judgment action is waived. Issue four is overruled.

### CONCLUSION

We affirm the trial court's order.

(Busby, J., joining the Opinion and concurring)

(Brown, J., joining both the Opinion and Concurring Opinion).

J. Brett Busby, Justice, concurring.

When a city and its elected officials refuse to comply with a citizen-initiated

amendment to the city charter that limits the city's ability to raise taxes and other revenue, can its taxpaying citizens ask the courts to order their representatives to obey the law? We hold today that the courts of Texas are open to their suit.

In reaching this conclusion, we confront a clash among fundamental principles of government. The City of Houston and its Mayor contend that doctrines of standing and governmental immunity shield their position—that the Proposition 2 charter amendment is ineffective—from even being questioned in court. The citizen-plaintiffs respond that their representatives must give effect to the charter amendment as an exercise of direct legislative power by the people, and that the Texas Legislature and the courts have modified standing and immunity doctrines in order to ensure the rule of law: the principle that government is subordinate to the law and thus individuals exercising governmental power must respect its limits.

The majority opinion, which I join, correctly applies these modifications to hold that the plaintiffs have standing and that governmental immunity does not bar their suit. Because standing and immunity are notoriously complex and changing doctrines, featuring fictions and exceptions that do not always seem coherent,[1] I write separately to explain how the structural principles of government at stake support our holding.

## I. The City's standing and immunity arguments implicate fundamental principles of government.

### A. The rule of law

The Texas Constitution's Bill of Rights provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. Our Bill of Rights also ensures that citizens may seek a remedy in Texas courts for unlawful deprivations: "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Id. § 13.

These sections, like the Due Process Clauses of the Federal Constitution,[2] have an ancient heritage. In Magna Carta, King John gave sanction to the rule of law by agreeing not to deny free men "right or justice" or deprive them of liberty or property except "by the law of the land."[3]

"Th[e] outlawing by Magna Carta of certain arbitrary and capricious executive action against private citizens went a long way toward establishing" that "the king himself was subordinate to the law," and that his exercise of sovereign authority was not legitimate when he acted outside its bounds. Steven G. Calabresi, *The Historical Origins of the Rule of Law in the American Constitutional Order*, 28 Harv. J. L. & Pub. Pol'y 273, 276 (2004). The American colonists relied on this principle centuries later, listing King George III's repeated violations of law among their reasons for declaring independence. *See* The Declaration of Independence (U.S. 1776).

Americans eventually ratified a Federal Constitution designed to preserve the rule

---

1. *See, e.g.,* Douglas Laycock, *Modern American Remedies* 482 (3d ed. 2002).

2. *See* U.S. Const. amends. V, XIV.

3. Charles R. Eskridge III, *Modern Lessons from Original Steps Towards the American Bill of Rights*, 19 Tex. Rev. L. & Pol. 25, 29 (2016) (quoting Magna Carta (June 15, 1215), *reprinted in Sources of our Liberties: Documentary Origins of Individual Liberties in the United States Constitution and Bill of Rights* 11, 17 cl. 39–40 (Richard L. Perry & John C. Cooper eds., rev. ed. 1978)).

of law against an all-powerful executive while also guarding their liberty and property against the infringements by elected legislatures that had occurred under the weak Articles of Confederation. Calabresi, *supra*, at 278–79. To maintain the balance between order and freedom and secure the rule of law, the Federal Constitution limited governmental power by dividing it vertically and horizontally using the framework "we know as federalism and the separation of powers" and by including "a strong Bill of Rights." *Id.* at 279. As Alexander Hamilton observed in the Federalist Papers, a separate and independent judiciary "is peculiarly essential" in preserving these limits imposed by the people on their representatives in government.[4]

Our Texas Constitution also limits governmental power, and it goes even further than its federal counterpart by including "an explicit Separation of Powers provision to curb overreaching and to spur rival branches to guard their prerogatives." *In re State Bd. for Educator Certification*, 452 S.W.3d 802, 808 n.39 (Tex. 2014) (orig. proceeding) (citing Tex. Const. art. II, § 1). In addition, as noted above, the Texas Bill of Rights expressly recognizes the role of courts in providing due course of law. Tex. Const. art. I, § 19.

The constitutional guarantee of procedural due course of law requires the government, at minimum, to provide notice that it is depriving a citizen of a liberty or property interest as well as "an opportunity [for the citizen] to be heard at a mean-

ingful time and in a meaningful manner." *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929–930 (Tex. 1995). In the hearing, the citizen's challenge to the deprivation must be determined "according to law." *Freeman v. Ortiz*, 106 Tex. 1, 153 S.W. 304, 304 (1913). In this way, our due course of law guarantee empowers courts to resolve disputes about whether officials are legitimately exercising governmental power within the democratically established limits of the law.

The plaintiffs in this case contend, in part, that they are entitled to have a court hear and determine their complaint that the City is collecting taxes and fees from them and spending the money in violation of the Proposition 2 charter amendment, which they consider a valid part of the City's own governing law. I explore below how rule-of-law values, including plaintiffs' constitutional right to due course of law, interact with the doctrines of standing and immunity on which the City relies.

## B. Popular sovereignty and direct democracy

Before reaching those doctrines, it is also important to consider the status of the Proposition 2 charter amendment, which was proposed through a citizen initiative and adopted by popular vote. The Texas Constitution recognizes that "[a]ll political power is inherent in the people, and all free governments are founded on their authority, and instituted for their

---

4. *The Federalist* No. 78, at 466 (Clinton Rossiter ed., 1961) ("The complete independence of the courts of justice is peculiarly essential in a limited Constitution ... which contains certain specified exemptions to the legislative authority.... Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of

particular rights or privileges would amount to nothing."); *id.* (concluding that "every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void," and rejecting the alternative "that the representatives of the people are superior to the people themselves; that men acting by virtue of powers, may do not only what their powers do not authorize, but what they forbid").

benefit." Tex. Const. art. I, § 2. The people generally have chosen a republican form of government for our state and its political subdivisions, electing representatives to exercise political power on their behalf. But people in home-rule municipalities like the City of Houston also have the right to exercise sovereign power directly by submitting a petition to amend the city charter signed by the required number of qualified voters and approving the charter amendment in an election. *See* Tex. Loc. Gov't Code Ann. § 9.004(a) (West 2008); Houston, Tex., City Charter art. VII-b (effective 1913) (amended 1991). This form of direct democracy through "the power of initiative and referendum, as provided for in the city's charter, is the exercise by the people of a power reserved to them, and not the exercise of a right granted." *Taxpayers' Ass'n of Harris County v. City of Houston*, 129 Tex. 627, 105 S.W.2d 655, 657 (1937).[5]

Although elected representatives may not like the result when voters intervene directly in making public policy, the Supreme Court of Texas has rejected attempts to limit citizens' direct lawmaking power. *See Glass v. Smith*, 150 Tex. 632, 244 S.W.2d 645 (1951). "[T]o protect the people of the city in the exercise of this reserved legislative power, ... charter provisions should be liberally construed in favor of the power reserved." *Taxpayers' Ass'n*, 105 S.W.2d at 657; *see also City of Houston v. Todd*, 41 S.W.3d 289, 298 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). In this case, there can be no dispute that the citizens of Houston were entitled

to exercise their sovereign function under the city charter to impose limits on their representatives' exercise of the power to raise revenue.[6]

## C. Standing

The City contends, however, that plaintiffs lack standing to sue to enforce the limits contained in Proposition 2. "The standing requirement stems from two limitations on subject matter jurisdiction": the interpretation of our constitutional separation-of-powers provision "to prohibit courts from issuing advisory opinions"; and the limitation of our constitutional guarantee of "open courts ... [to] those litigants suffering an injury." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993).

Generally, to establish standing, "a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury." *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001). Citizens do not ordinarily have a right to bring suit challenging governmental decision-making because "[g]overnments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000) (citing *Osborne v. Keith*, 142 Tex. 262, 177 S.W.2d 198, 200 (1944)); *see also Andrade v. Venable*, 372 S.W.3d 134, 136 (Tex. 2012).

---

5. Under the City Charter, an initiative is a petition seeking a vote on a proposed ordinance or resolution, while a referendum is a petition seeking a vote that an ordinance or resolution enacted by the City Council shall not take effect. *See* Houston, Tex., City Charter art. VII-b, §§ 2–3. The charter amendment at issue was adopted as an initiative.

6. Given the procedural posture of the case, we do not reach the merits of the City's argument that the Proposition 2 charter amendment is invalid because it is inconsistent with the Proposition 1 amendment, which received more votes.

Both the courts and the Legislature have created exceptions to this general rule, however. Plaintiffs argue that the court-created exception for taxpayer standing applies here.[7] Texas courts long ago recognized that taxpayers may sue to enjoin the illegal collection of funds by government,[8] which is consistent with the general standing rule because the actual or threatened loss of the taxpayer's own funds is a particular injury. But Texas courts also hold that taxpayers have standing to enjoin the future illegal expenditure of state or local funds without demonstrating a particular injury.[9] This exception is founded on the rule of law: it "provides important protection to the public from the illegal expenditure of public funds without hampering too severely the workings of the government." *Bland Indep. Sch. Dist.*, 34 S.W.3d at 556.

The taxpayer standing exception recognized by Texas courts mirrors the doctrine of municipal taxpayer standing used in federal courts. *Williams*, 52 S.W.3d at 181; *see also DaimlerChrysler v. Cuno*, 547 U.S. 332, 349, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). Federal courts recognize a narrower standing exception for taxpayers who contend that federal or state expenditures violate the Federal Constitution, requiring them to "establish a logical nexus between being a taxpayer and the type of action challenged, and demonstrate a link between their taxpayer status and the precise nature of the constitutional violation alleged." *Williams*, 52 S.W.3d at 181. This test has been met only with respect to Establishment Clause violations,[10] as the Federal Constitution lacks detailed fiscal regulations of the sort that often appear in state constitutions and laws and in municipal charters and ordinances. The Texas courts' approach to taxpayer standing promotes the rule of law by making such legal limits on taxing and spending power enforceable.[11] In Part II.A. below, I address whether the taxpayer standing exception applies in this case.

The Legislature may also expand standing by statute. *Scott v. Bd. of Adjustment*, 405 S.W.2d 55, 56–57 (Tex. 1966). Plaintiffs argue that they have standing by virtue of Proposition 2 itself, which is an act of municipal legislative power that expressly confers standing on any voter to enforce its provisions. Because another panel of

---

7. In a prior case, another panel of this Court held that plaintiffs lacked standing to challenge the City's refusal to enforce Proposition 2. *White v. Robinson*, 260 S.W.3d 463, 470–75 (Tex. App.—Houston [14th Dist.] 2008), *vacated on other grounds sub nom. Robinson v. Parker*, 353 S.W.3d 753 (Tex. 2011). This holding does not control our analysis of taxpayer standing because plaintiffs did not raise that exception as a basis for standing in the prior case.

8. *See Davis v. Burnett*, 77 Tex. 3, 13 S.W. 613 (1890); *Morris v. Cummings*, 91 Tex. 618, 45 S.W. 383, 385 (1898); *George v. Dean*, 47 Tex. 73, 84 (1877); *Blessing v. City of Galveston*, 42 Tex. 641, 654 (1875).

9. *See Venable*, 372 S.W.3d at 137; *Williams*, 52 S.W.3d at 179; *Calvert v. Hull*, 475 S.W.2d 907, 908 (Tex. 1972); *Osborne*, 177 S.W.2d at

200; *Hoffman v. Davis*, 128 Tex. 503, 100 S.W.2d 94, 95 (1937) ("When a taxpayer brings an action to restrain the illegal expenditure ... of tax money he sues for himself, and it is held that his interest in the subject-matter is sufficient to support the action"); *Terrell v. Middleton*, 187 S.W. 367, 369 (Tex. Civ. App.—San Antonio 1916), *writ ref'd*, 108 Tex. 14, 191 S.W. 1138 (1917) (per curiam); *City of Austin v. McCall*, 95 Tex. 565, 68 S.W. 791, 794 (1902); *Hendee v. Dewhurst*, 228 S.W.3d 354, 378–79 (Tex. App.—Austin 2007, pet. denied).

10. *Cuno*, 547 U.S. at 347, 126 S.Ct. 1854.

11. *See* Joshua G. Urquhart, *Disfavored Constitution, Passive Virtues? Linking State Constitutional Fiscal Limitations and Permissive Taxpayer Standing Doctrines*, 81 Fordham L. Rev. 1263, 1265–67, 1295–96 (2012).

this Court rejected plaintiffs' argument in a prior case, I do not revisit it here.[12]

### D. Immunity

The City next contends that its governmental immunity bars plaintiffs' suit. "Sovereign immunity requires the state's consent before it can be sued." *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017). Cities and other political subdivisions of the state share in this immunity—referred to as "governmental immunity"—when they are performing governmental functions. *Gates v. City of Dallas*, 704 S.W.2d 737, 738–39 (Tex. 1986).

The doctrine of immunity, which does not appear in our Constitution, has its origins in the common law and the feudal fiction that "the King can do no wrong." *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015); *see Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006); *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). The reasons given for the doctrine "have evolved over the centuries," and its modern "purpose is pragmatic: to shield the public from the costs and consequences of improvident actions of their governments." *Tooke*, 197 S.W.3d at 331–32. Immunity also "preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars." *Brown & Gay Eng'g*, 461 S.W.3d at 121.

As with standing, both the courts and the Legislature have recognized exceptions to immunity. The common-law exceptions likewise have deep historical roots, tracing their heritage to courts' issuance of writs of habeas corpus, mandamus, and injunction against government officials to check acts in excess of lawful authority or compel the performance of a clear legal duty.[13] In

explaining why mandamus was the correct remedy for a government official's refusal to carry out his ministerial duty to deliver a commission, Chief Justice Marshall in *Marbury v. Madison* looked to the rule of law: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). The Supreme Court of the United States rejected the argument that "the heads of departments are not amenable to the laws of their country," quoting *Blackstone's Commentaries* to show that the common law furnished methods of detecting errors and misconduct by government agents that injured private property rights. *Id.* at 164–65. The Court adopted the legal fiction that when a government official's "powers are limited by statute, his actions beyond those limitations [that affect the plaintiff's property] are considered individual and not sovereign actions," and thus immunity does not bar a suit against him for specific relief. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 701–02, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

Texas courts also recognize an *ultra vires* exception, which allows a plaintiff to sue a government official who "acted without legal authority or failed to perform a purely ministerial act." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). An official acts without legal authority "if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Houston Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). Because an official's unauthorized

---

12. *See White*, 260 S.W.3d at 473–75.

13. *See* Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judi-* *cial Independence*, 35 Geo. Wash. Int'l L. Rev. 521, 524–25 & nn. 7-10 (2003).

acts "should not be considered acts of the state at all," a citizen's suit to protect his property against such acts is not barred by immunity. *Hall*, 508 S.W.3d at 238; *see also Heinrich*, 284 S.W.3d at 370.

The Supreme Court of Texas has explained that "*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state" over one of its officials. *Heinrich*, 284 S.W.3d at 372. "Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy." *Id.* While acknowledging the modern fiscal rationale for immunity, the supreme court concluded that it does not apply to *ultra vires* suits: "extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended." *Id.*

The illegal collection of revenue is one type of *ultra vires* act to which immunity does not apply. As the supreme court observed in addressing the procedural due process available to contest the constitutionality of a tax, "consent of the Legislature is not required in order to sue the County Tax Assessor-Collector for recovery of an illegal tax involuntarily paid under duress." *Shaw v. Phillips Crane & Rigging of San Antonio, Inc.*, 636 S.W.2d 186, 188 (Tex. 1982). Consent is unnecessary because "revenue generated from a tax determined to be illegal should not be treated as property of the State or municipality to which the principles of sovereign immunity apply, and an illegally collected fee should be refunded if paid as a result of ... duress, without respect to waiver of sovereign immunity." *Nivens v. City of League City*, 245 S.W.3d 470, 474 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

Aside from these deeply rooted common-law exceptions, Texas courts have been reluctant to recognize other types of suits to which immunity does not apply, preferring to defer to the Legislature to determine when immunity should be waived. *Brown & Gay Eng'g*, 461 S.W.3d at 121. The Legislature has been active in waiving immunity, concluding that governmental activities should be subordinate to the law in many areas where courts have not found an exception.

One such waiver appears in the Uniform Declaratory Judgments Act. The Act authorizes a person whose rights are affected by a statute or municipal ordinance to have a court "determine[ ] any question of construction or validity arising under" the statute or ordinance "and obtain a declaration of rights ... thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (West 2015). If the question "involves the validity of a municipal ordinance ..., the municipality must be made a party and is entitled to be heard." *Id.* § 37.006(b). This requirement to make the municipality a party is a waiver of its immunity from suit. *Heinrich*, 284 S.W.3d at 373 n.6. In Part II.B., I discuss whether this waiver and the *ultra vires* exception apply here.

## II. Under these principles, plaintiffs have standing and governmental immunity does not bar their suit.

Understanding how the rule of law and popular sovereignty have shaped the doctrines of standing and immunity helps to show why neither doctrine bars this suit. I examine the parties' arguments under each doctrine in turn.

### A. Plaintiffs have taxpayer standing.

To establish taxpayer standing, a plaintiff must plead facts showing that: (1) he is a taxpayer; and (2) public funds are expended on the allegedly illegal activity. *Williams*, 52 S.W.3d at 179. It is undisputed that plaintiffs are City taxpayers. In

their petition, plaintiffs "seek[ ] to prevent the illegal expenditure of public funds not yet expended." They assert in some detail that the City has "assessed, collected and spent" funds illegally exceeding the revenue cap in Proposition 2, as well as the cap in Proposition 1—which is calculated differently and which the City recognizes as valid. They also allege that the City plans to continue these practices under its current and proposed budgets.

The City responds that these allegations are insufficient because taxpayer standing to challenge an illegal expenditure does not extend to this suit to enforce legal limits on the collection of revenue. The City also argues that plaintiffs have failed to specify the illegal activity on which the funds were spent.

The City's response is misplaced for three reasons. First, if it is illegal for the City to collect the revenue in the first place, it cannot legally spend that revenue on any activity. Thus, plaintiffs have alleged "an expenditure of public funds that would not otherwise be made." *Venable*, 372 S.W.3d at 139.

Second, as discussed above, Texas law recognizes that taxpayers have standing to challenge illegal collection as well as illegal expenditure of revenue. Indeed, both challenges share a common purpose. In upholding a taxpayer's standing to challenge the expenditure of state funds exceeding the governor's constitutionally capped salary to buy chicken salad and other supplies for his use, the court in *Terrell v. Middleton* explained:

> Citizens are allowed to prevent, by injunction, the collection of illegal taxes, and the reasons for allowing them this power are no stronger than to allow restraint of an officer who seeks to expend the taxes when collected for an illegal or unconstitutional purpose. The diversion of the taxes after collection from legal purposes would be equally as injurious to the taxpayer as the collection of illegal taxes. In either event, the burdens of the taxpayer are increased.

187 S.W. 367, 369 (Tex. Civ. App.—San Antonio 1916), *writ ref'd*, 108 Tex. 14, 191 S.W. 1138 (1917) (per curiam); *see also Calvert v. Hull*, 475 S.W.2d 907, 908 (Tex. 1972).

Third, plaintiffs also have a right to procedural due course of law to test whether the City collected revenue from them in violation of its own charter. *See McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Fla. Dep't of Bus. Regulation*, 496 U.S. 18, 36, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) ("Because exaction of a tax constitutes a deprivation of property, the State must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause."); *Shaw*, 636 S.W.2d at 188. For each of these reasons, the trial court correctly rejected the City's plea to the jurisdiction challenging plaintiffs' standing.

## B. Governmental immunity does not bar plaintiffs' suit.

Plaintiffs, who have sued the City of Houston as well as the Mayor in his official capacity, offer a different response to each defendant's assertion of governmental immunity. Plaintiffs allege that the City's immunity has been waived under the Declaratory Judgments Act, and they seek declarations that the caps in both Propositions 1 and 2 are valid, and that budgets for fiscal years 2011 through 2017 exceed the caps and are unauthorized. Recognizing the City's position that a "poison pill" provision in Proposition 1 invalidates Proposition 2, plaintiffs contend that the "poison pill" is itself invalid, or alternatively that Proposition 1 in its entirety and another section of the city charter are invalid.

These declarations fall within the Act's waiver of immunity, which extends to "claims that a statute is invalid for constitutional or nonconstitutional reasons and claims merely seeking interpretation or clarification of a statute." *Lone Star Coll. Sys. v. Immigration Reform Coal. of Tex. (IRCOT)*, 418 S.W.3d 263, 271 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). The City asserts that plaintiffs are primarily seeking to validate the propositions. But the statute does not require the plaintiff to seek invalidity; it simply requires a "proceeding that involves . . . validity." Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b). This proceeding involves the validity of Proposition 2, which the City contends is invalid. Moreover, plaintiffs are seeking to invalidate budget ordinances for noncompliance with Propositions 1 and 2, and to invalidate the "poison pill" provision in Proposition 1 in order to defeat the City's position that Proposition 2 is invalid.[14]

Turning to the Mayor, plaintiffs allege that the *ultra vires* exception to governmental immunity applies because the Mayor "acted without legal authority . . . in permitting the illegal assessment, collection and expenditure of drainage fees, in exempting those drainage fees from the caps in Propositions 1 and 2, in passing budgets for FY 2011 to FY 2017 which exceed the caps and violate the other provisions of Proposition 1 and 2, and in expending public monies which exceed the caps in Proposition 1 and 2." They seek prospective injunctive relief segregating and ultimately directing the proper disposition of monies exceeding the caps.

The City responds that the acts alleged are not within the authority of the Mayor, who merely submits a proposed budget to the members of City Council (non-parties to this suit). But as the majority opinion points out, this evidence regarding the Mayor's budget authority does not conclusively negate all of plaintiffs' allegations regarding the Mayor's actions. Accordingly, the trial court correctly rejected the plea to the jurisdiction based on governmental immunity.

\* \* \*

"What this case is really about," says the City, is whether plaintiffs may seek to enforce "a broad restriction on the amount of revenue the City may collect from all sources." In the City's view, that "is a political issue, not a legal issue." The City is incorrect.

When the Mayor of Houston and the members of the City Council look down from their dais in the Council Chamber, they see the following words written above the doors: "The people are the city." The people settled the political issue of how much revenue their government may collect from them: they initiated the Proposition 2 amendment to the City Charter and approved it at the ballot box. Whether the City and the Mayor must comply with this limit on their authority is a legal issue, and doctrines of standing and governmental immunity—as shaped by our rule-of-law values—do not bar the people from asking a court to resolve that issue. The City is not above the law. I therefore respectfully concur in the decision to affirm the trial court's order denying the plea to the jurisdiction.

---

14. Because the Act's waiver of immunity applies, we need not consider whether Proposition 2 also waived the City's immunity by expressly giving a voter the right to enforce the charter amendment by injunction or other remedy.